UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARVIN COTTON, individually, and
ANTHONY LEGION, individually;

        Plaintiffs,

                                  No.   22-cv-10037

-v-                                 Hon.  Judith E. Levy

DONALD HUGHES, in his individual
capacity; WALTER BATES, in his
individual capacity; ERNEST WILSON,
in his individual capacity; SANTONION
ADAMS, in his individual capacity;
jointly and severally,

        Defendants.

---

## <u>FIRST AMENDED COMPLAINT AND RELIANCE ON JURY DEMAND</u>

NOW COME the Plaintiffs, MARVIN COTTON, individually, and

ANTHONY LEGION, individually, by and through their attorneys, MUELLER

LAW FIRM, by WOLFGANG MUELLER, and file their Complaint against the

Defendants, DONALD HUGHES, in his individual capacity; WALTER BATES,

in his individual capacity; ERNEST WILSON, in his individual capacity; and

SANTONION ADAMS, in his individual capacity, in this civil action, stating unto

this Court as follows:

    1.     This is an action for damages brought pursuant to 42 U.S.C. §§1983

and 1988, the Fourth, Sixth, and Fourteenth Amendments to the United States

Constitution against Defendants, DONALD HUGHES ("HUGHES"), in his

individual capacity; WALTER BATES ("BATES"), in his individual capacity;

ERNEST WILSON ("WILSON"), in his individual capacity; and SANTONION

ADAMS ("ADAMS), in his individual capacity.

2.　　Jurisdiction is founded upon 28 U.S.C. §1331.

3.　　Venue is proper based on the situs of the incident, which occurred in

the City of Detroit.  28 U.S.C. §1391.

## **GENERAL ALLEGATIONS**

4.　　At all pertinent times Plaintiff, MARVIN COTTON, was a United

States citizen.

5.　　At all pertinent times Plaintiff, ANTHONY LEGION, was a United

States citizen.

6.　　At all pertinent times Defendant, HUGHES, was employed as a

Sergeant by the Detroit Police Department ("DPD") and was acting within the

scope of his employment and under color of law.

7.　　At all pertinent times Defendant, BATES, was employed as a

Sergeant by the Detroit Police Department ("DPD") and was acting within the

scope of his employment and under color of law.

8.　　At all pertinent times Defendant, WILSON, was employed as a

Sergeant by the Detroit Police Department ("DPD") and was acting within the scope of his employment and under color of law.

9.    At all pertinent times Defendant, ADAMS, was employed as a police officer by the Detroit Police Department ("DPD") and was acting within the scope of his employment and under color of law.

10.    HUGHES, BATES, WILSON and ADAMS, as sworn police officers, had taken an oath, the Law Enforcement Code of Ethics, that stated in pertinent part: *"As a sworn police officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation and the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice."*

## GENERAL ALLEGATIONS

11.    Shortly before 2:00 a.m., on January 24, 2001, Jamond McIntyre was in his house on 3951 Third Street in the city of Detroit.  His sister, Danyell Ashford, had arrived around the same time to borrow some money from him.  On the porch, Ashford saw three men.  McIntyre came to the door and let Danyell and the three unknown men in the house at the same time.

12.    While inside the home, the three unknown men stood around the living room waiting on McIntyre.  McIntyre gave Danyell some money and she left.  The three unknown men remained in the house with McIntyre.  Danyell could not

identify the three men.

13.   Santonio Adams, an off-duty Detroit Police officer who was McIntyre's cousin, pulled in the driveway at McIntyre's house, but remained in the driveway while he waited on McIntyre to come out of the house.

14.   Adams was purportedly at the house to return the van to McIntyre.  In reality, however, Adams was working security for a neighborhood drug dealer and purportedly protecting the house.

15.   While waiting in the driveway, Adams purportedly heard McIntyre yell out his nickname, "Tone," and then heard gunshots.

16.   Adams looked up and saw two men firing shots, but he was unable to determine what they were shooting at or in which direction they were aiming. Adams ducked for cover towards the floor of the minivan.

17.   Adams claimed he was unable to disentangle his service weapon from his Gucci sweater, but he was lucky enough to find another "small Glock" on the floor of the van.  Adams then fired shots from the gun he just "found" through the driver-side window towards the porch.

18.   Adams did not know who the gun belonged to and did not see the gun previously when he was driving the van earlier that day.  Adams would later "lose" the gun fleeing from the area where he ran over to the Jefferies Projects.

19.   Police searched the area Adams claimed he ran, but they were unable to

4

find a handgun.

20. Adams made no statement to officers responding to the scene, did not give a description of the shooters, and was unable to identify anybody as the perpetrators.

21. Adams fabricated a statement regarding his innocent reason for being present at the crime scene and did not disclose his true role in the crime.

22. Kenneth Lockhart and Renay Tate were in the bedroom when the shooting started. Lockhart rushed Tate inside the closet while he ran to the master bedroom to get a gun.

23. Lockhart did not see the people who were shooting.  He only heard McIntyre yell out "Tone," and then he heard an array of gunshots.

24. When police arrived at the location they were unable to find McIntyre.

25. Adams made it back to the scene and directed the police to McIntyre's body, which was across the street down an alley.  McIntyre was dead and had suffered seven gunshot wounds.

26. Lockhart did not provide any names nor a description of the perpetrators to the police. According to Lockhart, "they really didn't take a statement from me, they threw me in there and said I'm a lie, I'm a crock of shit."

27. Sergeant Carl Fredrick, who had 25 years of experience with homicides, said that while interviewing Lockhart "he [Lockhart] changed his story

5

several times in talking to him, and what he said we couldn't substantiate by the physical evidence."

28.   After a thorough search of the crime scene, evidence technicians found three handguns inside the Third Street home.  Two handguns were across the street on the top of a building where the shooters had tossed them, and over 30 shell casings were scattered outside the home.  Police also obtained positive fingerprint lifts from the basement.  None of this physical evidence linked Plaintiffs to the offense.

29.   Three weeks later, Lockhart offered information to the DPD Officer-in-Charge ("OIC"), Sgt. Donald Hughes.  Hughes showed Lockhart a photo array.  Lockhart said #5 Cotton "looks like the guy who said 'kill him,' #2 (Legion) or #7 (Parks) looks like the guy I shot at."  Lockhart would testify that there was *"no doubt"* in his mind about the identification of the three perpetrators.[1]

30.   Defendant, Hughes, the OIC of the investigation, knew Lockhart was incorrect because Hughes knew Lockhart had not seen the perpetrators of the crime.  Hughes' knowledge was borne out when charges against Parks were later dismissed because he had an airtight alibi.

---

[1]   The Prosecutor's Office would later dismiss charges against the third perpetrator, Devonte Parks, when it became clear that he had an alibi for the time of the murder.  Parks was not cleared, however, until *after* Cotton and Legion were convicted, thus effectively preventing Parks from testifying to discredit Lockhart's identification.

31.    Hughes wanted both Plaintiffs arrested because he believed they were neighborhood thugs who robbed "dope boys."

32.    Based solely on Lockhart's fabricated identification, with no other physical or testimonial evidence, Marvin Cotton and Anthony Legion, along with Davaontae Parks, were charged with first degree murder and felony firearm and bound over for trial after a Preliminary Examination.

33.    Four days before trial, the prosecution indicated that they had a new witness—jailhouse informant Ellis Frazier Jr.

34.    Defendant, Bates, had taken a statement of Frazier Jr., who indicated that Cotton confessed to him in the Wayne County Jail.

35.    Bates had supplied all the details of the "confession" to Frazier Jr., who had never met Cotton in the jail.  Before Frazier Jr.'s appearance at trial, Bates showed Frazier Jr. a picture of Cotton and told him where Cotton would be sitting in court so Frazier Jr. could make an accurate in-court identification.

36.    Frazier testified that Cotton confessed to him in the Wayne County jail. Frazier indicated that Cotton and he were not in the same cell during the confession. Instead, the two were in separate but adjacent holding cells, each containing 30-40 inmates and separated by a brick wall.  The two never made eye-to-eye contact.

37.    Frazier and Cotton did not know each other prior to the confession.

Frazier maintained that another man in the cell with him, named "Anthony," introduced Cotton to him. Frazier and "Anthony" were in the same cell, but Cotton was in another cell, and Cotton confessed through the brick wall of a cell that contained at least other 30 men.

38.   At trial, despite not having eye-to-eye contact with Cotton in the jail bullpen, Frazier positively identified Cotton as the man who confessed to him. However, Frazier did not identify Anthony Legion as the man named "Anthony" who was involved in the conversation with Cotton.  Instead, Frazier identified Parks as the man who he claimed was "Anthony."  Frazier said that the man named "Anthony" was innocent.

39.   On October 12, 2001, three days before trial, the prosecutor severed Parks[2] case from Legion and Cotton.

40.   Kenneth Lockhart testified at trial that he was 90% sure that Legion came inside the Third Street home some five minutes after he heard shooting outside the house and 100% sure about Cotton and Parks.

41.   On October 19, 2001, the jury found Cotton and Legion guilty of all

---

[2]  The Prosecutor's Office dismissed Parks' case when it became clear that he had an alibi for the time of the murder.  However, the Prosecutor's Office waited until the following week *after* Legion and Cotton were convicted before it officially dropped the charges against Parks, thus effectively preventing Parks from testifying as a defense witness to discredit Lockhart's identification.

charges, based solely on Lockhart's fabricated identification and Frazier's fabricated statements of Cotton's "confession."

42.  On November 12, 2001, MARVIN COTTON was given a life sentence without the possibility of parole.

43.  On November 14, 2001, ANTHONY LEGION was given a life sentence without the possibility of parole.

44.  There was no physical evidence linking Plaintiffs to the murder.

45.  There was no forensic evidence linking Plaintiffs to the murder.

46.  There were no confessions.

47.  The only evidence linking Plaintiffs to the crime was Lockhart's fabricated identification and Frazier's fabricated testimony about Cotton's 'confession."

## POST-TRIAL DEVELOPMENTS

48.  Following years of unsuccessful appeals, Plaintiffs were able to have their cases reviewed by the Wayne County Conviction Integrity Unit ("CIU").

49.  Newly-discovered evidence developed by the State Appellate Defender's Office ("SADO") and the CIU that was not presented at Plaintiffs' trial included the following, as set forth in the Wayne County Prosecutor's Office press release announcing the dismissal of charges against Plaintiff:

- The OIC, Sgt. Donald Hughes withheld from the prosecutor and the

9

defense, and the jury did not hear, that the investigation of McIntyre's murder initially revealed nothing tying Plaintiff to the crime because the (later) "eyewitness," Keith Lockhart, saw nothing.

- The OIC withheld from the prosecutor and the defense, and the jury did not hear, that Plaintiff was only identified as an assailant in McIntyre's murder after the OIC repeatedly spoke to a drug dealer connected to McIntyre.

- The OIC withheld from the prosecutor and the defense, and the jury did not hear, that the OIC had multiple interactions "off the record" with a drug dealer and intentionally did not make a report about those interactions and the interview where the drug dealer identified Plaintiff. The "official" police file only contained a statement that the drug dealer denied knowing anything about the murder.

- The OIC withheld from the prosecutor and the defense, and the jury did not hear, that Lockhart was not the first person to make identifications of the assailants in this case. Instead, it was the drug dealer.

- The OIC withheld from the prosecutor and the defense, and the jury did not hear, that even though Lockhart knew Cotton prior to the murder and claimed to have seen the assailants the night of the murder, he never implicated Cotton until three weeks later when the OIC re-approached him with the information he gathered from the drug dealer.

- The OIC withheld from the prosecutor and the defense, and the jury did not hear, that Mr. McIntyre was involved and active in a drug organization at the time of his death and that the Third Street house was owned by the head of the organization.

- The OIC withheld from the prosecutor and the defense, and the jury did not hear, that the Third Street house was a "spot" that Mr. McIntyre was "holding down" and selling drugs from, and his cousin was suspected of providing "security" for the organization.

- The jury did not hear that the third defendant, Parks, never introduced Cotton to the jailhouse witness, and Cotton did not confess (thereby implicating Legion) to the jailhouse witness about their involvement in

10

McIntyre's murder.

- The jury did not hear that Lockhart identified three people involved in McIntyre's murder – Cotton, Legion, and third defendant (Parks) and testified that there was "no doubt" in his mind about his identification of the third defendant.

- The jury did not hear that Parks provided an alibi that was verified by DPD.

- The jury did not hear that the case against Parks was going to be dismissed due to the misidentification made by the eyewitness.

50.    Jailhouse informant, Ellis Frazier Jr., has recanted his testimony that Cotton confessed in the county jail.  Specifically, Frazier admitted that a homicide detective manufactured[3] his statement, that he was promised benefits to act as an agent, that he was shown pictures of Cotton prior to coming to court and was told where Cotton would be sitting so that he could make an in-court identification, and that his overall testimony was completely false.

51.    Kurt Nard, a friend of the "eyewitness," Keith Lockhart, has given sworn testimony, via affidavit, that Lockhart told him he did not see the shooters and that he was bribed by his uncle, a drug dealer, to frame Plaintiff and the two co-defendants.

---

[3]  Wayne County Prosecutor Chief of Operations Robert Agacinski drafted a memo warning about illegal tactics with jailhouse informants being utilized by homicide detectives.  New evidence also demonstrates that DPD homicide detectives were conspiring with jailhouse informants to manufacture statements that defendants confessed to murder while awaiting trial.

11

52.     Nard's affidavit states that in February 2001, Keith Johnson told Lockhart to identify Marvin Cotton and two others as the shooters and gave Lockhart $10,000 to lie about seeing the shooters.  Lockhart told Nard he did so because he was afraid of his uncle and needed the money.

53.     Nard wrote notes on a napkin and contacted the DPD.  Nard was visited by Defendant, Bates, who took a written statement from him.  Nard also gave Bates the notes he made on a napkin. The evidence contained in the statement and on the napkin are referred to as the "Kurt Nard evidence."

54.     Despite having the "Kurt Nard evidence" almost one year before Plaintiffs were tried for murder, Bates did not disclose this information to prosecutors.

55.     Bates disclosed the Kurt Nard evidence to Defendant, Hughes, the OIC in the case, who also knowingly withheld the information from prosecutors.

56.     Defendant, Wilson, withheld case Progress Notes from the prosecutor. The Progress Notes showed that Lockhart never mentioned seeing the shooter(s). Such information would clearly impeach Lockhart's in-court identifications in front of the jury.

57.     Wilson did disclose the Progress Notes to Hughes, the OIC, who also had access to the Progress Notes.

58.     Hughes, Bates, Wilson and Adams each knew that McIntyre was

maintaining the house on Third Street as a "dope house' for Keith Johnson, a major drug dealer in Detroit.

59.     New evidence uncovered during the post-trial investigation revealed that Renay Tate, Lockhart's girlfriend, was also threatened by Keith Johnson on several occasions to support the false testimony of Lockhart at Plaintiff's trial.

60.     Prior to Plaintiff's 2001 trial, Johnson threatened to kill Tate, her children, her sister, and her sister's child if she did not testify in a way that promoted Plaintiffs' conviction.

61.     Tate later said that on the night of McIntyre's murder, she heard gunshots and immediately ran into the bedroom closet and shut the door. Immediately after the shooting, Lockhart called "Mareo Jones" and said, "It's done".  Tate also said Lockhart got some phone calls from "Tony" -- the police officer -- after the gunshots.

62.     Lockhart and Tate were arrested in connection with the McIntyre murder. According to Tate, she was physically assaulted by DPD detectives and had bruises all over her face by the time she was released from custody.  *Id*.

63.     As a result of the newly discovered evidence, the CIU submitted the case to Wayne County prosecutor, Kym Worthy.  Prosecutor Worthy agreed to vacate the conviction and dismiss criminal charges.

64.     On October 1, 2020, Plaintiffs' criminal convictions were vacated.

Criminal charges were dismissed the same day.

65.     By the time charges were dismissed, Plaintiffs had been in jail and/or

prison for over 19.5 years for a crime they did not commit.

66.     The individual defendants' misconduct, as set forth below, were a

direct and proximate cause of Plaintiffs' injuries and damages, including:

      a.     Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over nineteen and one-half years;

      b.     Severe emotional distress for the period from their arrest to the present, including, but not limited to: the emotional distress of being charged with murder, facing a sentence of life in prison without the possibility of parole; and being wrongfully convicted of crimes the Defendants knew they did not commit;

      c.     Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

      d.     Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

      e.     Loss of enjoyment of daily activities;

      f.     Not being able to attend the funerals of several family members and loss of relationships;

      g.     Physical injuries suffered in prison;

      h.     Loss of employment and educational opportunity, past income, and future earning capacity;

      i.      Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

      j.      Many of Plaintiffs' injuries and damages are likely to be permanent;

      k.      Other damages which may be revealed through discovery.

## COUNT I
## *"BRADY"* VIOLATIONS BY ALL DEFENDANTS

67.    Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

68.    At all times, Plaintiffs had a constitutional right of due process, guaranteed by the 14th Amendment, to be free from police officers deliberately choosing not to disclose to the prosecutor material and apparent exculpatory and/or impeachment evidence.

69.    The individual Defendants knowingly violated their unwavering legal duty (*"Brady"* duty) to disclose to the prosecutors all material evidence where its exculpatory and impeachment value was apparent, by intentionally and deliberately choosing not to tell the prosecutor the following:

**Hughes**

15

- The evidence discovered by the Wayne County CIU and set forth in paragraph 49;

- That he knew Lockhart had not seen the shooter(s) and that Lockhart's identifications were false and based on threats and intimidation from a drug dealer;

- That Kurt Nard had supplied evidence directly impeaching Lockhart's identifications;

- That Frazier, Jr.'s testimony was completely false and the product of the DPD Homicide Section's longstanding practice of fabricating "confessions" made to jailhouse informants by supplying the informants with facts of the case;

- That the murder victim, McIntyre, maintained the Third Street house as a "dope house" for Keith Johnson, a major drug dealer in Detroit;

- That DPD case Progress Notes further indicated that Lockhart had not seen the shooter(s);

**Bates**

- That Kurt Nard had supplied evidence to him directly impeaching Lockhart's identifications;

- That Frazier, Jr.'s testimony was completely false; that Bates had supplied Frazier Jr. with the evidence contained in Frazier's written statement; and that Frazier's statement and testimony were the product of the DPD Homicide Section's longstanding practice of fabricating "confessions" made to jailhouse informants;

- That the murder victim, McIntyre, maintained the Third Street house as a "dope house" for Keith Johnson, a major drug dealer in Detroit;

16

- That DPD case Progress Notes further indicated that Lockhart had not seen the shooter(s);

**Wilson**

- That he knew Lockhart had not seen the shooter(s) and that Lockhart's identifications were false and based on threats and intimidation from a drug dealer;

- That Frazier, Jr.'s testimony was completely false and the product of the DPD Homicide Section's longstanding practice of fabricating "confessions" made to jailhouse informants;

- That the murder victim, McIntyre, maintained the Third Street house as a "dope house" for Keith Johnson, a major drug dealer in Detroit;

- That DPD case Progress Notes further indicated that Lockhart had not seen the shooter(s);

**Adams**

- That he knew Lockhart had not seen the shooter(s) and that Lockhart's identifications were false and based on threats and intimidation from a drug dealer;

- That Adams was acting as "security" for drug dealer Keith Johnson at the time of the murder;

- That the murder victim, McIntyre, maintained the Third Street house as a "dope house" for Keith Johnson, a major drug dealer in Detroit;

70. The individual defendants' deliberate and knowing failure to disclose

the above-referenced evidence to the prosecutor resulted in material exculpatory

17

and impeachment evidence not being turned over to Plaintiffs' defense counsel, in violation of the State's *Brady* obligations.

71. Hughes, Bates, Wilson and Adams' *Brady* violations resulted in Plaintiffs not receiving a fair trial, described as "a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, (1995). Had the individual defendants disclosed the *Brady* evidence, there would have been no arrest, much less a conviction, as it would have completely tainted the entire investigation, including the alleged "confession" claimed by Ellis Frazier, Jr. A re-trial that included the *Brady* evidence would result in a voluntary dismissal, directed verdict, or acquittal.

72. The *Brady* evidence cited above would have been apparent to any reasonable officer acting in good faith.

73. Plaintiffs' right to be provided with material exculpatory and impeachment evidence ("*Brady*" evidence), was clearly established before 2001. *See Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) ("In fact, at least three circuits recognized prior to August 1990, the earliest possible date for Detective Ingles' involvement in the case, that this right was clearly established.").

## COUNT II
## FEDERAL MALICIOUS PROSECUTION BY ALL DEFENDANTS

74. Plaintiffs incorporate by reference each preceding paragraph as if

fully stated herein.

75.    At all times, Plaintiffs had a constitutional right, guaranteed by the 4th and 14th Amendments, to be free of illegal seizure and continued detention without probable cause, based on fabricated evidence, false statements, and/or material omissions which were knowingly or recklessly made, in order to manufacture probable cause for an arrest and conviction.

76.    Defendant, Hughes, as OIC, was under a constitutional duty to make truthful statements to the prosecutor and magistrate judge to establish probable cause for an arrest warrant.

77.    Defendant, Hughes, as OIC, and Defendant, Bates, were under a constitutional duty to refrain from creating and using fabricated evidence, namely the alleged "confession" made by Cotton to jailhouse snitch, Ellis Frazier, Jr., to manufacture to support continued detention and a conviction.

78.    Defendant, Adams, was under a constitutional duty to make truthful statements in his reports to the prosecutor and magistrate judge to establish probable cause for an arrest warrant.

79.    Defendant, Hughes, influenced or participated in the initiation of criminal prosecution and/or Plaintiffs' continued detention when he deliberately and knowingly supplied false information and omitted material information which showed a reckless disregard for the truth in requesting an arrest warrant, and

swearing to facts in support of probable cause, which was material to a finding of probable cause.

80.     Hughes's false statements and material omissions included:

    a.     Not telling the prosecutor or judge that Ellis Frazier Jr.'s statement was completely fabricated by Bates and was untrue;

    b.     Not telling the prosecutor or judge that the DPD Homicide Section had used jailhouse informants (snitch witnesses) as agents and listening posts for years to help secure convictions;

    c.     Affirmatively indicating that Kenneth Lockhart had identified Plaintiffs as the shooter(s) (along with Davontae Parks) when Hughes knew Lockhart had not seen the shooter(s); and

    d.     Other false statements or omissions of material facts that were knowingly or recklessly made, that will be discovered during the course of this lawsuit.

81.     Defendant, Bates, influenced or participated in the initiation of criminal prosecution and/or Plaintiffs' continued detention when he deliberately and knowingly supplied false information and omitted material information which showed a reckless disregard for the truth in support of probable cause for Plaintiffs' arrest and continued detention.

82.     Bates's fabricated evidence, false statements and material omissions included:

    a.     Not telling the prosecutor or judge that Ellis Frazier Jr.'s

20

statement was completely fabricated by Bates and was untrue;

b.   Not telling the prosecutor or judge that the DPD Homicide Section had used jailhouse informants (snitch witnesses) as agents and listening posts for years to help secure convictions;

c.   Not telling the prosecutor or judge that Kurt Nard told him Lockhart admitted he had not seen the shooter(s); and

d.   Other false statements or omissions of material facts that were knowingly or recklessly made, that will be discovered during the course of this lawsuit.

83.   Defendant, Wilson, influenced or participated in the initiation of criminal prosecution and/or Plaintiffs' continued detention when he deliberately and knowingly supplied false information and omitted material information which showed a reckless disregard for the truth in support of probable cause for Plaintiffs' arrest and continued detention.

84.   Wilson's false statements and material omissions included:

a.   Not telling the prosecutor or judge that case Progress Notes indicated that Lockhart had not seen the shooter(s); and

b.   Other false statements or omissions of material facts that were knowingly or recklessly made, that will be discovered during the course of this lawsuit.

85.   Defendant, Adams, influenced or participated in the initiation of criminal prosecution and/or Plaintiffs' continued detention when he deliberately

and knowingly supplied false information and omitted material information in

police reports which showed a reckless disregard for the truth in support of

probable cause for Plaintiffs' arrest and continued detention.

86.  Adams' false statements and material omissions included:

   a.  Not telling the prosecutor or judge that he was acting as
       "security" for the dope house on Third Street for drug
       dealer Keith Johnson.

   b.  Other false statements or omissions of material facts that
       were knowingly or recklessly made, that will be
       discovered during the course of this lawsuit.

87.  But for the individual defendants' fabricated evidence, false

statements and material omissions set forth above, probable cause for Plaintiffs'

arrest and continued detention would have been lacking.

88.  The Wayne County Prosecutor's Office's motion to vacate

convictions and voluntarily dismiss charges against Plaintiffs constitutes a

"favorable termination" of the underlying criminal case.

89.  Plaintiffs' right not to be seized and continuously detained without

probable cause, based upon a police officer's deliberate and knowing fabrication of

evidence and false statements and material omissions to prosecutors and magistrate

judges, guaranteed by the 4th and 14th Amendments, was clearly established

before January 2001.  *See Gregory v. Louisville,* 444 F.3d 725, 744 n. 8 (6th Cir.

2006) (knowing fabrication of evidence to manufacture probable cause violates

constitutional rights at least as early as 1992); *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) ("[A]n officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant.").

## COUNT III

## <u>FABRICATION OF EVIDENCE BY DEFENDANTS HUGHES AND BATES</u>

90.    Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

91.    At all times, Plaintiffs had constitutional rights guaranteed by the 4th and 14th Amendments, to be free from police officers fabricating evidence to aid in a conviction.

92.    Defendant, Hughes, violated Plaintiffs' constitutional rights described above by the following misconduct:

      a.    Fabricating Lockhart's identification of Plaintiffs and Davontae Parks, as described above.

93.    Defendant, Bates, violated Plaintiffs' constitutional rights described above by the following misconduct:

      a.    Fabricating Frazier Jr.'s statement and testimony of Cotton's jailhouse confession, as described above.

94.    The fabricated evidence affected the decision of the jury, as they were

the only pieces of inculpatory evidence offered against Plaintiffs at trial.

95.     Plaintiffs' right to be free from the use of fabricated evidence to aid in a conviction was clearly established long before January 2001. *See Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) ("[t]he reasoning in *Spurlock* is sound, and we follow it in holding that Stoiker was on notice in 1975 that it was unlawful for him to fabricate evidence") (citing *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir. 1999)).

WHEREFORE, Plaintiff, MARVIN COTTON, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including:

a.  Past and future compensatory damages against all defendants in a minimum amount of Forty Million Dollars (**$40,000,000.00**);

b.  Punitive damages as to Defendant, HUGHES, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

c.  Punitive damages as to Defendant, BATES, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

d.  Punitive damages as to Defendant, WILSON, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

e.  Punitive damages as to Defendant, ADAMS, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

f.  Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

g.  The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

h.    Such other and further relief as appears just and proper.

WHEREFORE, Plaintiff, ANTHONY LEGION, prays for damages for his

wrongful detention and imprisonment, in violation of the Constitution, as set forth

above, jointly and severally as to all Defendants, including:

i.    Past and future compensatory damages against all defendants in a minimum amount of Forty Million Dollars (**$40,000,000.00**);

j.    Punitive damages as to Defendant, HUGHES, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

k.    Punitive damages as to Defendant, BATES, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

l.    Punitive damages as to Defendant, WILSON, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

m.    Punitive damages as to Defendant, ADAMS, in a minimum amount of Ten Million Dollars (**$10,000,000.00**);

n.    Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

o.    The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

p.    Such other and further relief as appears just and proper.

## COUNT IV
## STATE LAW MALICIOUS PROSECUTION BY DEFENDANTS HUGHES, BATES, WILSON, AND ADAMS

96.    Plaintiffs incorporate by reference each preceding paragraph as if

fully stated herein.

97.    The underlying criminal proceedings against Plaintiffs ultimately terminated in their favor with a dismissal of the charges in state court on October 1, 2020.

98.    The criminal investigation and prosecution were undertaken without probable cause or good faith, and with malice.  They were not undertaken with the intention of bringing Plaintiffs to justice for having committed the alleged murder. Instead, the individual Defendants acted to frame Plaintiffs for the murder of Jamond McIntyre because the homicide detectives believed Plaintiffs were thugs who robbed drug dealers.  The individual defendants knew that absent the fabricated evidence, there was no evidence against Plaintiffs to support probable cause for arrest or continued detention.

99.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiffs were charged and convicted of crimes they did not commit, causing them to suffer the special injuries and damages set forth above.

WHEREFORE, Plaintiffs pray for such past and future compensatory and exemplary damages against all Defendants as are available pursuant to MCL 600.2907 and the common-law of the State of Michigan, together with pre-judgment interest, costs, and attorney fees in an amount to be determined by the Court.

Respectfully submitted,

MUELLER LAW FIRM


*s/Wolfgang Mueller*
WOLFGANG MUELLER
Attorney for Plaintiffs
41850 W. Eleven Mile Rd., Ste. 101
Novi, Michigan 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

Dated:  January 14, 2022

## <u>RELIANCE ON JURY DEMAND</u>

Plaintiffs rely on their previously filed jury demand in the above-captioned matter.

<div style="margin-left: 40%">

Respectfully submitted,

MUELLER LAW FIRM


*s/Wolfgang Mueller*
WOLFGANG MUELLER
Attorney for Plaintiffs
41850 W. Eleven Mile Rd., Ste. 101
Novi, Michigan 48375
(248) 489-9653
wolf@wolfmuellerlaw.com
(P43728)

</div>

Dated:  January 14, 2022