# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

Marvin Cotton and Anthony
Legion,

                Plaintiffs,

v.

Donald Hughes, Walter Bates,
Ernest Wilson, and Santonion
Adams,

                Defendants.

_____/

Case No. 22-cv-10037

Judith E. Levy
United States District Judge

Mag. Judge David R. Grand

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' SECOND AMENDED MOTION FOR SUMMARY JUDGMENT [96]

Before the Court is Defendants' Second Amended Motion for Summary Judgment. (ECF No. 96.) Plaintiffs filed a response, (ECF No. 102), and Defendants replied. (ECF No. 105.) For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part.

# I.    Background

This litigation arises from criminal proceedings set in motion by the killing of Jamond McIntyre in Detroit, Michigan.

## A.    The Killing of Jamond McIntyre

Around 2:00 AM on January 24, 2001, McIntyre let his sister and three men into a house at 3951 Third Street in Detroit. (ECF No. 3, PageID.39–40.) McIntyre gave his sister some money and she left. At some point after that, a gun battle broke out. When the police arrived, McIntyre lay dead in a nearby alley from gunshot wounds.

During these events, an off-duty Detroit Police Department ("DPD") officer, Santonion Adams (who was also McIntyre's cousin), sat outside the house in a vehicle. Plaintiffs allege that Adams "was working security for a neighborhood drug dealer and [] protecting the house [on Third Street]." (ECF No. 3, PageID.40.) Adams reported seeing three men chasing McIntyre. He also stated that he was unable to retrieve his service weapon, but that he exchanged fire with the three men using a gun he found on the floor of the vehicle he was in. (ECF No. 102, PageID.4871; ECF No. 102-2, PageID.4920.) He later said he lost the gun

2

nearby while fleeing to call the police, but investigators were unable to locate the weapon. (*Id.*)

When the shooting began, Kenneth Lockhart, who lived at 3951 Third Street, and Renay Tate, Lockhart's girlfriend, were in a bedroom in the house. Plaintiffs assert that Lockhart "rushed Tate inside the closet" in the bedroom, went to retrieve a gun, and heard McIntyre cry out for help from Adams. (ECF No. 102, PageID.4871; ECF No. 3, PageID.40.) Lockhart initially stated he encountered three men in the house, one of whom told the other two to kill him. An officer on the scene noted that Lockhart's story changed "several times" and his claims about shooting a gun at the three men did not match the physical evidence at the scene. (ECF No. 102-2, PageID.4920.)

## B.    Investigation, Trial, and Conviction

Lockhart, who did not identify the shooters during the initial investigation, participated in a photo array on February 15, 2001, and identified Marvin Cotton, Anthony Legion, and Devonte Parks.[1] (ECF

---

[1] McIntyre's sister did not identify any of the men who were in the house on January 24. (ECF No. 96-4, PageID.3635.) McIntyre's girlfriend was also present at the house on January 24 and saw the three men, but she too left before the shooting occurred and did not make an identification of the shooters. (*Id.* at PageID.3588–

No. 102-5, PageID.4945.) He indicated that Cotton ordered the others to kill him, and Legion or Parks looked like the person at whom he fired his gun. (ECF No. 102-5, PageID.4945; ECF No. 102-6, PageID.4947.) He also reported that he had seen all three the day before the shooting playing pool at the house on Third Street. (*Id.*) No physical evidence tied Plaintiffs to the crime and Lockhart was the only eyewitness who identified Cotton and Legion.

Plaintiffs' preliminary examinations took place in March 2001. Under Michigan law, the functions of a preliminary examination are to "determine whether a felony was committed and whether there is probable cause to believe the defendant committed it." *People v. Yost*, 468 Mich. 122, 125–26 (2003). In concluding that there was probable cause to proceed to trial, the judge at Plaintiffs' preliminary examination relied upon Lockhart's testimony identifying them. (ECF No. 96-5, PageID.3673–3674 (stating that Lockhart's identification created a "question of fact").)

---

3593.) A man who lived nearby woke up during the shooting and, although he saw two gunmen, he did not make an identification. (*Id.* at PageID.3637–3640.)

On October 5, 2001, while Cotton and Legion were in pretrial detention, a jailhouse informant named Ellis Frazier Jr. provided the DPD with a statement saying that in June 2001, Cotton spoke to him in jail and sought his legal advice. (ECF No. 102-13, PageID.5070.) He stated that Cotton confessed to the murder in great detail and included references to Lockhart. (*Id.*) This conversation purportedly took place despite Cotton and Frazier being in separate but adjoining holding cells, and Frazier being unable to see Cotton at any time while the confession took place. (*See* ECF No. 102-16, PageID.5206, 5227–5228.)

Probable cause was also found to try Devonte Parks in connection with McIntyre's killing after Lockhart identified Parks, stating he had "no doubt" Parks was one of the shooters. (ECF No. 102-11, PageID.5016.) However, Parks provided an alibi that was confirmed, and the prosecution severed Parks' case from Plaintiffs' a few days before trial. (ECF No. 102, PageID.4874 n.4.) After trial, on October 26, 2001, the charges against Parks were dismissed. (ECF No. 102-14, PageID.5073.) The purported third perpetrator was never located. Because of the delay in dropping the charges against Parks, Plaintiffs claim they were unable to call him as a defense witness. (ECF No. 102, PageID.4874 n.4.)

Plaintiffs' jury trial began in Wayne County on October 15, 2001. Lockhart identified Plaintiffs at trial as the men who entered the house the morning of January 24. (ECF No. 96-7, PageID.3945–3960.) Frazier also testified that Cotton had confessed to the crime. (ECF No. 102-16, PageID.5220.) Frazier stated that he had not received any kind of benefit from the police or prosecutors for his testimony. (*Id.* at PageID.5216.)

In their closing, the prosecution emphasized Lockhart and Frazier's testimony. (*See* ECF No. 102-17, PageID.5272–5273 (stating that Lockhart indicated there was "no question" it was Cotton and arguing that Cotton told Frazier things "only the killer could know" and that this "confession" was made to a non-police officer, "which makes it even more reliable").) No physical evidence linking Plaintiffs to the murder was presented at trial. (*See* ECF No. 96, PageID.3522; ECF No. 102, PageID.4875.) On October 19, 2001, Cotton and Legion were found guilty of first-degree murder and felony firearm. (ECF No. 102-8, PageID.4953; ECF No. 102-9, PageID.4958.) Plaintiffs both received sentences of life without parole.

Shortly after Legion's conviction, he pled nolo contendere to second degree homicide in a second, unrelated case, and was sentenced to a term of 8½ to 20 years in that case. (ECF No. 102-28, PageID.5526.)

## C.   The Vacation of Plaintiffs' Convictions

In 2020, Plaintiffs' sentences were vacated following an investigation by the Wayne County Conviction Integrity Unit ("CIU"). The evidence relied upon in the CIU's investigation forms the basis of Plaintiffs' claims in this litigation. (*See* ECF No. 102-24; ECF No. 96, PageID.3539, 3541.)

### i.   *The Hughes Tape*

In or around 2010, a private investigator named Ken Myree taped a conversation with Hughes without Hughes' knowledge.[2] During the conversation, Hughes asserted that the house where McIntyre was murdered was owned by a drug dealer named Keith Johnson. (ECF No. 102-22, PageID.5344–5345.) He stated that Johnson and McIntyre were related, and McIntyre was selling drugs out of the Third Street house. (*Id.* at PageID.5345–5346.) Hughes also stated that Cotton and Legion

---

[2] An officer that worked with Hughes identified Hughes' voice on the relevant tape. (ECF No. 102-32, PageID.5642.)

were involved in robbing drug houses during the period when McIntyre was murdered. (*Id.* at PageID.5346.)

While talking to Myree, Hughes stated that Lockhart had "never seen" Cotton and "doesn't know him." (*Id.* at PageID.5348.) Later, however, he says "Kenny Lockhart saw them," apparently referring to the people who killed McIntyre. (*Id.* at PageID.5349.) Hughes also refers to an "off the record" interview with a drug dealer named Zachary Hearns who "put [him] on Cotton" during his investigation of McIntyre's murder. (*Id.* at PageID.5351–5352.) That is, Hughes disclosed that he omitted information from the investigative record and that information was the reason he had looked into Cotton as a suspect.

Hughes also states that Lockhart "didn't have no gun." (*Id.* at PageID.5354.) Plaintiffs argue that this statement indicates that "Hughes knew Lockhart did not have a gun at any time (so his story about shooting inside the house was not true which was consistent with the lack of physical evidence)." (ECF No. 102, PageID.4877.)

Additionally, Hughes stated that "Adams was probably security. I'm talking when they moving dope, following them around and stuff like that." (ECF No. 102-22, PageID.5355.)

ii.    *The Frazier Affidavit*

On March 29, 2014, Frazier signed a notarized affidavit recanting his testimony. (ECF No. 102-20.) He admitted to never having met Cotton in the pretrial lock-up facility, and he explained that his testimony was "pre-written" and fabricated by "the Homicide Detective." (*Id.* at PageID.5339.) Frazier describes contacting the Wayne County Prosecutor to offer his services as an informant, after which a detective visited him in jail, provided him with details about Plaintiffs' criminal case to memorize, and prepped him to provide testimony at trial. (*Id.* at PageID.5339–5340.)

Contradicting his trial testimony, Frazier stated in the affidavit that he testified at Plaintiffs' trial "in exchange for an earlier release from custody"—a deal that required him to lie if asked whether his testimony was incentivized by an early release from jail. (*Id.* at PageID.5340.) He further indicated that "the Detective" who brought him to court showed him a picture of Cotton and pointed Cotton out in court so that Frazier could identify Cotton in his testimony despite never having seen him in person before. (*Id.*) According to the affidavit, Frazier was released early in exchange for his testimony. (*Id.*)

9

### iii.    *The Nard Affidavit*

Later that year on October 8, 2014, a man named Kurt Nard provided a signed and notarized affidavit that raised questions about Lockhart's testimony. (ECF No. 102-18.) Nard explained that he was friends with Lockhart in 2001.

According to Nard, Lockhart stated to Nard that he initially told detectives that he never saw anyone on the night of McIntyre's murder, because he had been asleep. (*Id.* at PageID.5284.) Lockhart went on to tell Nard that after he spoke with detectives, Keith Johnson, McIntyre's uncle, offered him $10,000 to identify Cotton "and two other men that were not involved in the murder" as having come into the house after the shooting stopped on January 24, 2001. (*Id.*) Lockhart told Nard that Johnson's motivation for pointing to "the three men [was] a [previous] altercation" and that Johnson was pressuring him in a way that made him feel like he might have to "leave town" if he didn't "take the money and lie." (*Id.*) Not only did Lockhart think that Johnson was "very dangerous" and capable of killing him if he refused his request, but others were threatening him, as well. (*Id.* at PageID.5285.)

10

A few days later, in "February 2001," Nard says Lockhart told him he had taken Johnson's money and given the police a statement implicating Cotton. (*Id.*) Nard asserts that Lockhart also showed him what appeared to be "several thousand dollars" in a brown paper bag. (*Id.*) Nard states that the next day he contacted the DPD about what happened, participated in an interview with Defendant Bates and provided him with a statement about what Lockhart told him, and provided him with notes written on "two napkins" about his conversation with Lockhart. (*Id.*) He says the DPD never contacted him after that. (*Id.*)

By the time of his deposition in this case, Bates testified that he could not remember the McIntyre murder or the subsequent investigation and prosecution. (ECF No. 102-19, PageID.5300–5302, 5308–5309.) He also denied that he fabricated Frazier's testimony and denied that he ever spoke with Nard, though he could not remember the case at all. (*Id.* at PageID.5311, 5314, 5326–5327.)

In 2018, the CIU reviewed Plaintiffs' cases. The CIU concluded that Plaintiffs' convictions should be vacated because their trials were "fundamentally unfair" in a manner that "undermined the integrity of

the verdict." (ECF No. 102-24, PageID.5478–5480.) This conclusion was based on the CIU's analysis of the evidence discovered after the trial. (*Id.*)

Plaintiffs' convictions were vacated on October 1, 2020, after spending 19½ years in prison based on their convictions related to McIntyre's murder. (ECF No. 96-27.)

### D.   The Present Litigation

On January 6, 2022, Plaintiffs filed a complaint asserting state and federal claims against Defendants. (ECF No. 1 (Amended in ECF No. 3).) Plaintiffs narrowed their claims in response to Defendants' motion for summary judgment. In Plaintiffs' response to Defendants' motion for summary judgment, they voluntarily dismissed all claims against Adams, their federal malicious prosecution claims against Wilson and Bates, their fabrication of evidence claims against Wilson, and their state law malicious prosecution claims against Wilson and Bates. (ECF No. 102, PageID.4891 n.9, 4903 n.13, 4909 n.15, 4912 n.16.) During the hearing on the motion for summary judgment, Plaintiffs further indicated they would not be pursuing any claims against Wilson.

### II.   Legal Standard

12

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

Defendants argue that summary judgment is appropriate because Plaintiffs are collaterally estopped and, in any event, Defendants are protected by qualified immunity.[3]

---

[3] In the Eastern District of Michigan, briefs generally may not exceed 25 pages and replies may not exceed 7 pages. Local Rule 7.1(d). The Court permitted Defendants to file an opening brief of up to 44 pages and a reply of up to 10 pages. In Defendants' reply brief, they nonetheless complain that the additional pages for briefing they requested and received were "insufficient for purposes of arguing all defenses, legal and factual, and raising essential counterpoints." (ECF No. 105, PageID.5829.) As with several of Defendants' other arguments, they fail to cite law or to make any request to the Court in this section of the brief. Defendants do not

13

## A.   Collateral Estoppel

Defendants argue that Plaintiffs' claims are collaterally estopped or otherwise barred. They assert that Plaintiffs' convictions were not properly vacated, their claims are barred by the *Heck* doctrine, they are attempting to relitigate previously decided issues, and Legion cannot pursue damages because he was denied compensation under a Michigan statute. Additionally, they discuss certain of Cotton's public comments about the case. None of these arguments succeed.

---

mention—let alone spell out—any specific argument they would have made if they had requested and been afforded more pages.

Those deficiencies alone make the inclusion of this issue inappropriate. But it is worse than that. Defendants' opening brief goes on at length about a multitude of background facts that have little bearing on their substantive arguments. And as set forth below, they raise arguments that have been repeatedly rejected by other courts, including the Sixth Circuit, in similar cases. They dedicate a section of their reply brief to arguing for the dismissal of claims against Defendant Adams despite Plaintiffs voluntarily dismissing claims against Adams in their earlier response. In addition, at oral argument, counsel for Defendants alluded to testimony offered by Plaintiffs being induced, before quickly admitting Defendants had no evidence to support this claim. All of this undermines Defendants' complaint about page limits—especially in light of the expanded page limitations they were provided.

Defendants have had ample, fair opportunity to make their arguments, including during oral argument, when they faced no limitations whatsoever. To the extent that Defendants are indicating that the Court should obligate Plaintiffs to respond to arguments that Defendants have not offered, the Court declines to do so. It will instead consider the arguments the parties present in their briefs without regard to this complaint about page limits.

Federal courts must "apply the doctrine of collateral estoppel in the same manner as the state courts in the state in which the earlier judgment was rendered." *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)). Under Michigan law, as the Sixth Circuit sets forth,

> collateral estoppel applies when: (1) an issue has been actually litigated and determined by a valid and final judgment; (2) the same parties have had a full and fair opportunity to litigate the issue; and (3) there is mutuality of estoppel. *See Monat v. State Farm Ins. Co.*, 469 Mich. 679, 677 N.W.2d 843, 845–46 (2004). However, mutuality is not required when collateral estoppel is being invoked defensively. *Id.* at 844–45, 850.

*Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019).

### i.    The Vacation of Plaintiffs' Convictions

Defendants argue that Plaintiffs' claims are collaterally estopped, because their convictions were not properly vacated. (ECF No. 96, PageID.3546.) Defendants cite to Michigan Court Rule 6.502(A) in support of this argument, arguing that a different procedure should have been followed. (ECF No. 96, PageID.3546–3548.)

Plaintiffs respond that these arguments have been presented to other courts and were unsuccessful each time. (ECF No. 102, PageID.488.) The Sixth Circuit has indeed set forth that:

> "The preclusive effect of a state court judgment is determined by state law." *Peterson v. Heymes*, 931 F.3d 546, 554 (6th Cir. 2019). Under Michigan law, "crossover estoppel" "precludes the relitigation of an issue from a criminal proceeding in a subsequent civil proceeding, and vice versa." *Id.* (citing *Barrow v. Pritchard*, 235 Mich. App. 478, 597 N.W.2d 853, 855–56 (1999)). But when a criminal judgment has been vacated, the trial court's interlocutory rulings merge with the final judgment and are vacated as well. *Id.*; *see also Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) (stating that a vacated judgment "technically leav[es] nothing to which we may accord preclusive effect").

*Tanner v. Walters*, 98 F.4th 726, 735 (6th Cir. 2024); *see also Peterson*, 931 F.3d at 554 ("[V]acated rulings have no preclusive effect under Michigan law."). Plaintiffs' sentences have been vacated and therefore have no preclusive effect here. (*See* ECF Nos. 96-29, 96-30.)

Defendants fare no better in establishing estoppel by arguing that these convictions were vacated *improperly*. (ECF No. 96, PageID.3546–3548.) To support this argument, they accuse the CIU of colluding with Plaintiffs. (*Id.* at PageID.3547–3548.) Neither of the two pieces of evidence Defendants adduce in support of this contention are compelling.

16

They point to a CIU interviewer explaining to Legion that—following the CIU's investigation—it could choose to recommend a new trial or an exoneration as relief. (ECF No. 96-31, PageID.4761.) The interviewer makes clear that even if the CIU recommended relief for Legion, the Wayne County prosecutor might reject its recommendation and not agree to any relief. (*Id.*) These statements are factual information and nothing more. There is nothing in these comments that reveals anything nefarious about the CIU's decision to support the vacation of Legion's conviction. The other evidence cited by Defendants is Legion mentioning to the CIU interviewer that he had heard that McIntyre's uncle, Keith Johnson, and Adams were involved in the killing, after which he noted that he did not know anything more specific about their involvement. (ECF No. 96-31, PageID.4772.) Defendants suggest that this statement shows that "based on Legion's representations from a single interview, CIU unilaterally determined that he was wrongfully convicted." (ECF No. 96, PageID.3547.) In the interview, Legion goes on to provide more detail about rumors he had heard. (ECF No. 96-31, PageID.4772.) Legion also emphasizes that he is unable to speak to the truth of these rumors and the interviewer responds that they are "marking these as rumors."

17

(*Id.* at PageID.4772–4773.) None of these comments support the conspiratorial conclusions Defendants ask the Court to draw. They certainly do not demonstrate anything about the procedural propriety of the vacation of Plaintiffs' convictions.

In addition to lacking factual support for such speculation and innuendo, Defendants' argument lacks legal support. Another court in this district analyzed and rejected the same argument Defendants present here:

> [the] order [vacating the convictions] never has been reversed, vacated, set aside, or even challenged on appeal, nor has any collateral attack on the order ever been mounted by any party in a state forum. It is well settled that a federal court must afford the state court's final order of dismissal the same conclusive effect that would be given to it by the state courts. 28 U.S.C. § 1738; *Anderson v. City of Blue Ash*, 798 F.3d 338, 350 (6th Cir. 2015) ("'State-court judgments are given the same preclusive effect under the doctrines of res judicata and collateral estoppel as they would receive in courts of the rendering state.'") (quoting *Ohio ex rel. Boggs v. City of Cleveland*, 655 F.3d 516, 519 (6th Cir. 2011)). The defendants have not cited any decisional law supporting their innovative argument that such an order would not be regarded with fully final and conclusive effect by Michigan courts.
>
> The defendants also contend that the state court's order was procedurally irregular and should be disregarded because it was issued based on presentation of a "stipulation" rather than a "motion." However, they have not cited any legal

18

> authority for the proposition that this Court has any power to review or nullify the final order of a state court invalidating a criminal conviction. To the contrary, it is well settled that federal district courts generally have no authority to entertain appellate review of state court judgments, which is a prerogative exclusively reserved to the Supreme Court.

*Smith v. County of Wayne*, No. 21-12070, 2023 WL 8788944, at *11 (E.D. Mich. Dec. 19, 2023). Additionally, as to Defendants' reference to Michigan Court Rule 6.502(A), the *Smith* court explained that the defendants' arguments ignore that Rule 6.502(A) limits "*the right of a defendant* to present a motion for relief from judgment" in state court and does not restrict "a state trial court's authority . . . to vacate or set aside its own judgment of convictions." *Id.* at *12 (emphasis in original). Therefore, the argument that Plaintiffs cannot proceed with these claims because their convictions were not properly vacated fails.

### ii. The Heck Doctrine

Defendants also argue that the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994) bars Plaintiffs' claims. (ECF No. 96, PageID.3548.)

> In *Heck*, the Supreme Court held that
>
> to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose

> unlawfulness would render a conviction or sentence invalid, a
> § 1983 plaintiff must prove that the conviction or sentence has
> been reversed on direct appeal, expunged by executive order,
> declared invalid by a state tribunal authorized to make such
> determination, or called into question by a federal court's
> issuance of a writ of habeas corpus, 28 U.S.C. § 2254.

*Id.* at 486–87. The *Heck* court instructed that "a prisoner who has fully

exhausted available state remedies has no cause of action under § 1983

unless and until the conviction or sentence is reversed, expunged,

invalidated, or impugned by the grant of a writ of habeas corpus." *Id.* at

489.

Defendants argue that Plaintiffs' convictions were not properly set

aside. They claim that the state court's order vacating Plaintiffs'

sentences was ultra vires and was undertaken "with no legal support"

and therefore was lacking any basis for the exercise of authority. (ECF

No. 96, PageID.3550–3551.) However,

> "a state officer may be said to act ultra vires only when he acts
> without any authority whatever." *Skatemore, Inc. v. Whitmer*,
> 40 F.4th 727, 736 (6th Cir. 2022) (quoting *Pennhurst State
> Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984))
> (cleaned up). "The test to determine whether a state official
> has acted ultra vires is whether the state official had a
> colorable basis for the exercise of authority." *Ibid.* It is
> undisputed that the Michigan Court Rules grant authority to
> a state court to vacate or set aside a criminal judgment after

20

the conclusion of direct appeal under Michigan Court Rule
6.501 *et seq.*

*Smith*, 2023 WL 8788944, at *12; *see also* Michigan Court Rule 6.509
(describing that the Michigan state courts have the power to enter orders
declaring that a sentence is invalid). Defendants argue that the Michigan
court that vacated Plaintiffs' sentences did so by stipulation and not by
motion, not that it lacked the power to vacate their sentences. (ECF No.
96, PageID.3550 ("Upon information and belief, there is no legal support
that sanctions vacatur of a criminal conviction without a Motion to
Dismiss or Motion to Vacate having been filed with the Court.").)
Defendants' contention that the state court acted ultra vires is therefore
without merit. They cite no cases where a federal district court has held
that a state court's vacation of a criminal sentence was ultra vires based
on an alleged procedural inadequacy.

*Heck* is therefore not an obstacle for Plaintiffs, because their
convictions were set aside. (*See* ECF No. 102, PageID.4885.) Other courts
in this district have recognized this point. *Smith*, 2023 WL 8788944, at
*12 ("There is no authority for the proposition that the *Heck* doctrine has
any applicability where the criminal judgment has been vacated by the
state court."); *see also Ansari v. Jimenez*, No. 2:20-cv-10719, 2022 WL

21

22831556, at *2 (E.D. Mich. Oct. 31, 2022) ("Because Plaintiff's underlying conviction was vacated, *Heck* is inapplicable."). Defendants' appeals to *Heck* do not support their request that the Court grant summary judgment.

### iii.        *Relitigating Previously Decided Issues*

Defendants argue that Plaintiffs are relitigating previously decided issues from their criminal cases and that the elements of collateral estoppel therefore apply. (ECF No. 96, PageID.3551–3553.) They fail to demonstrate that they can meet the first element of collateral estoppel under Michigan law, however. *See Monat v. State Farm Ins. Co.*, 469 Mich. 679, 682 (2004) ("(1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment" (cleaned up)). The Sixth Circuit has held that, under Michigan law, when a criminal judgment is vacated, the interlocutory rulings leading up to that judgment are vacated, as well. *Peterson*, 931 F.3d at 554. Plaintiffs' criminal convictions were vacated, so the same rule applies and there is no valid and final judgment in place that precludes the Court's consideration of these issues. Defendants are incorrect to

22

argue that collateral estoppel precludes Plaintiffs' claims, so their argument here fails.

      *iv.*     *Legion's Wrongful Imprisonment Compensation Act Lawsuit*

Defendants argue that Legion is barred from receiving any damages, because the Michigan Court of Claims barred Legion from compensation under the Wrongful Imprisonment Compensation Act ("WICA") due to his nolo contendere plea in an unrelated murder. (ECF No. 96, PageID.3553–3554.) Defendants' argument relies entirely on a section of the Michigan Court of Claims' opinion, ruling on Legion's WICA complaint. *See Legion v. State*, No. 21-000201, 2022 WL 7586209 (Mich. Ct. Claims July 6, 2022).[4]

---

[4] "Under the Act, '[c]ompensation may not be awarded . . . for any time during which the plaintiff was imprisoned under a concurrent or consecutive sentence for another conviction.' MCL 691.1755(4). As explained by our Supreme Court, the Legislature 'presumably saw little utility in compensating someone for a wrongful conviction if they would have been incarcerated anyway under a concurrent sentence that was independent of the wrongful conviction.' *Ricks v State, 507* Mich 387, 401; 968 NW2d 428 (2021). Legion's concurrent sentence was independent of his wrongful convictions and covered the entirety of his imprisonment for his wrongful convictions. Thus, subsection (4)'s plain language bars Legion from any compensation under the Act because the entire time Legion was imprisoned for his wrongful convictions he was also 'imprisoned under a concurrent . . . sentence for another conviction.' MCL 691.1755(4)." *Id.* at *1 (alterations in original).

Defendants' argument is conclusory and unpersuasive. They do not explain how the Michigan Court of Claims' holding impacts Legion's federal claims, which manifestly do not arise under WICA. WICA allows for suits against the state of Michigan by individuals who were convicted and served time in Michigan state correctional facilities for crimes they did not commit. Mich. Comp. Laws § 691.1753. The statute is not an exclusive remedy for vacated or wrongful convictions; it does not impact whether a plaintiff can bring separate claims against individuals. Mich. Comp. Laws § 691.1755(8) ("[T]he acceptance by the plaintiff of an award under this act, or of a compromise or settlement of the plaintiff's claim, does not operate as a waiver of, or bar to, any action in federal court against an individual alleged to have been involved in the investigation, prosecution, or conviction that gave rise to the wrongful conviction or imprisonment[.]"). A Michigan court's interpretation of a Michigan statute as it applies to Legion's claims against the state does not impact his claims against Defendants in their individual capacities. The language of WICA makes clear that Defendants miss the mark entirely. Accordingly, Defendants' argument for summary judgment based on Legion's WICA lawsuit fails.

24

v.      *Cotton's Purported Admissions*

Perhaps the most perplexing arguments presented by Defendants relate to comments Cotton made in a media interview and in his deposition.

They point to a news article where Cotton states that his trial counsel, Robert Slameka, failed to investigate a key alibi witness or put her on the stand, in addition to referencing other inadequacies. (ECF No. 96-2, PageID.3572.) Defendants state that Cotton is "blaming DPD," because he is unable to hold Slameka accountable for his failures. (ECF No. 96, PageID.3521.) Despite failing to raise any legal arguments relating to Cotton's comments in the news article in their opening brief, Defendants point out in their reply that the Court should note that Plaintiffs chose not to address this argument in their response brief. (ECF No. 105, PageID.5830.) It is unsurprising that Plaintiffs declined to respond to arguments that are wholly without merit or relevance to the issues in this litigation. Even if Cotton told a reporter that he believed his trial counsel was deficient, that does not shed light on whether Defendants violated Cotton's rights. And Defendants provide no reason to conclude otherwise.

25

Defendants also assert that in Cotton's deposition he "admitted being present at 3951 Third Street at approximately 2:15 a.m. the morning of McIntyre's murder ***and*** that he interacted with Lockhart." (ECF No. 105, PageID.5830 (emphasis in original).) There are multiple deficiencies with Defendants' arguments about these comments.

First, they fail to raise this evidence, or any legal argument related to it in their opening brief. It is, of course, not proper to raise new arguments in a reply brief, because it prevents Plaintiffs from responding. *See Sundberg v. Keller Ladder*, 189 F. Supp. 2d 671, 682–83 (E.D. Mich. 2002); *Salter v. Olsen*, 605 F. Supp. 3d 987, 1000–01 (E.D. Mich. 2022). That alone is a basis for the Court to disregard these arguments.

Second, Defendants fail to provide the Court with the deposition where Cotton purportedly made the relevant comments. They provide no direct quotes from the transcript of the deposition either. At oral argument, the Court asked Defendants to cite to the parts of the record where Cotton made these comments. They were unable to do so. When asking the Court to grant summary judgment, Defendants must support their position by "citing to particular parts of materials in the record."

26

Fed. R. Civ. P. 56(c)(1)(A). Having failed to do so, the Court cannot consider these arguments, which are based upon evidence Defendants have failed to present, as the Federal Rules require.

Third, even if Defendants had properly presented this purported evidence to the Court, it is not clear whether Defendants claim Cotton admitted to interacting with Lockhart on the night of the murder or that he admitted to interacting with Lockhart more generally. Defendants' argument that, based on this evidence, Plaintiffs' claims "must be critically examined" therefore does not support the conclusion that summary judgment is warranted. (ECF No. 105, PageID.5832.) There is a genuine dispute of material fact about Cotton's whereabouts on the relevant night, as well as about his interactions with Lockhart—and Defendants' unsupported description of this evidence does not change that. Accordingly, these arguments, as well as Defendants' arguments that Plaintiffs' claims are collaterally estopped or otherwise barred, fail.

### B.   Qualified Immunity

Defendants argue that they are entitled to qualified immunity with respect to all of Plaintiffs' claims. They do not contest that the rights

27

Plaintiffs assert were clearly established; rather they argue that Plaintiffs' rights were not violated.

>    i.    *Legal Standard*

Qualified immunity means that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008).

Courts must determine "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Id*. Courts have discretion to analyze the two prongs of the qualified immunity analysis in either order. *Pearson v. Callahan*, 555 U.S. 223, 242–43 (2009). "[I]f the facts alleged and evidence produced, viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate." *Barton v. Martin*, 949

F.3d 938, 947 (6th Cir. 2020). Because Defendants agree that the rights at issue were clearly established, the question is whether Plaintiffs present evidence of constitutional violations sufficient to present their claims to a jury.

To be held liable for a constitutional violation, a defendant must have committed the violation through their "own individual actions" and cannot be held liable based on "proximity" to wrongdoing or *respondeat superior*. *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 490 (6th Cir. 2020) (citations omitted). Plaintiffs have the burden of demonstrating Defendants are not entitled to qualified immunity. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).

### ii.   *Brady Violations*

In the complaint, Plaintiffs allege that Defendants Hughes and Bates violated their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 3, PageID.51–54.) Plaintiffs summarize their *Brady* claims in their response to the motion for summary judgment as involving "Defendants Bates and Hughes' non-disclosure of the Kurt Nard evidence, the "Donald Hughes tape" evidence regarding Lock[h]art, and the Ellis Frazier/snitch witness program evidence." (ECF No. 102,

29

PageID.4894.) At the hearing related to this motion, Plaintiffs' counsel indicated they are no longer pursuing claims against Wilson.

### a.   Legal Standard

*Brady v. Maryland* holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).[5] Police may be held liable under the *Brady* rule. *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) ("[P]olice are just as much an arm of the state as the prosecutor [and] inflict the same constitutional injury when they hide, conceal, destroy, withhold, or even fail to disclose material exculpatory information."). Police have an obligation to disclose material exculpatory evidence to the prosecutor, in contrast to the prosecutor who must disclose such evidence to the defense. *D'Ambrosio v. Marino*, 747 F.3d 378, 389 (6th Cir. 2014). To bring such a claim,

---

[5] In their reply brief, Defendants argue that the proper remedy for a *Brady* violation is retrial or an appeal in the underlying 2001 criminal case. (ECF No. 105, PageID.5833.) Instead of citing any law to support this idea, they cite comments from the CIU. (*Id.* at PageID.5833–5834.) A plaintiff may, of course, seek damages for violations of their constitutional rights through § 1983, including for *Brady* violations. *See, e.g.*, *Westerfield v. United States*, 483 F. App'x 950, 955–56 (6th Cir. 2012). Defendants' unsupported argument to the contrary lacks any legal basis whatsoever.

Plaintiffs must show that "(1) the evidence at issue is favorable to [them]; (2) the State, either willfully or inadvertently, suppressed that evidence; and (3) prejudice ensued." *Harbison v. Bell*, 408 F.3d 823, 830 (6th Cir. 2005).

The Sixth Circuit has set forth that

> [f]avorable evidence is material for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *see also Jamison v. Collins,* 291 F.3d 380, 385 (6th Cir. 2002) ("The prejudice (or materiality) element of a Brady violation is established if there is a reasonable probability of a different outcome of the trial had the *Brady* material been available."). For purposes of determining reasonable probability, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

*Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003). The Court, therefore, reviews the evidence that Plaintiffs argue was not disclosed.

b.   *Kurt Nard Evidence*

Plaintiffs assert that Bates and Hughes committed *Brady* violations by failing to disclose information shared by Kurt Nard, a friend

31

of the key trial witness, Lockhart. Nard provided an affidavit to Cotton's defense team in 2014 that discusses conversations between Nard and Lockhart and Nard's interview with Bates. (ECF No. 102-18.) In that affidavit, Nard states that Lockhart described being woken up by the gun shots, being interviewed by police and not identifying any assailants, and being bribed and pressured by Johnson (a drug dealer and uncle of the victim, McIntyre) to implicate Cotton and two other unnamed men. (*Id.* at PageID.5284–5285.) Nard states that after being pressured by Johnson and others, Lockhart took money from Johnson and gave a statement to police identifying all three suspects. (*Id.* at PageID.5285.) He then asserts that he told Bates about his conversations with Lockhart and provided Bates with "notes . . . on the two napkins regarding the conversation . . . with [Lockhart]." (*Id.*) This evidence falls under the *Brady* rule and—viewed in the light most favorable to the non-moving party—should have been turned over to the prosecution.

Evidence that Lockhart, who provided important testimony in the criminal case, was influenced by threats and bribery is favorable to Plaintiffs. A reasonably jury could easily conclude that Lockhart's testimony would have been undermined by this evidence.

32

There is a genuine dispute of material fact as to whether the evidence was suppressed. Plaintiffs assert that Defendants failed to disclose this evidence to the prosecutor. (ECF No. 102, PageID.4897.) Defendants have taken conflicting stances on whether this evidence was suppressed. In Bates' deposition, he states that he never met with Nard he has no recollection of doing so, and, if he had, Nard's statement would have been taken down and included in the relevant file. (ECF No. 96-32, PageID.4823.) Defendants argue that Bates' testimony means that Nard simply does not exist, and therefore his statements could not have been disclosed. (ECF No. 96, PageID.3556.)[6] At the hearing on this motion, Defendants' counsel asserted that Cotton's criminal trial counsel knew about Nard and chose not to call him as a witness. Counsel then admitted that he could not point to anything in the record to support that contention and walked back his previous representation to the Court.

---

[6] Defendants state that "[w]hen deposed, Bates . . . denied Nard's existence." (ECF No. 96, PageID.3556 (citing "Ex. 27, 40:6-7, 19:24").) However, the cited portions of Bates' depositions do not contain any testimony regarding Nard's existence. One portion addresses a different affiant, Ellis Frazier. (ECF No. 96-32, PageID.4802.) In the other portion, Bates testifies that he does not have any recollection of meeting with Kurt Nard. (*Id.* at PageID.4823.) Defendants' contention is completely unsupported by these citations.

Defendants' positions are wildly contradictory. It cannot be that Nard does not exist and that Cotton's trial counsel knew about Nard's existence and made a strategic decision not to call Nard at trial.

Additionally, the evidentiary support for Defendants' two contradictory positions is—in both cases—insufficient for summary judgment. As far as denying Nard's existence, Defendants' claim is presented as resting entirely on Bates' testimony. As far as attributing knowledge of Nard to Cotton's criminal trial counsel, Defendants have offered no evidence whatsoever. Plaintiffs, on the other hand, have presented an affidavit from Nard, which supports the inference that evidence about the falsity of Lockhart's testimony was suppressed. (ECF No. 102-18.) As a result, there is a question of fact about whether that evidence was suppressed.

The suppression of this evidence is prejudicial given that it would have undermined key eyewitness testimony in Plaintiffs' criminal trial. Defendants refer to Lockhart as "the prosecution's chief witness." (ECF No. 96, PageID.3528.) He identified both Plaintiffs at trial. (ECF No. 96-7, PageID.3958–3959 (stating he was "one hundred percent certain" that he saw Cotton in the house and "about 90 percent sure" he saw Legion).)

34

Defendants admit that no physical evidence linked Plaintiffs to the crime. (ECF No. 96, PageID.3522.) Accordingly, all the requirements for asserting a *Brady* claim are met.

Defendants assert that Nard's affidavit is "utterly worthless" because Nard was not deposed. (ECF No. 96, PageID.3555.) Rule 56 states that parties can rely on affidavits to oppose summary judgment. *See* Fed. R. Evid. 56(c)(1)(A). That rule does not oblige Plaintiffs to depose Nard and Defendants provide no legal basis to conclude otherwise.[7]

Defendants also allude to hearsay concerns about this evidence, though they make no effort to spell these worries out. (*See* ECF No. 96, PageID.3556 ("Affidavits, which are out-of-court statements, might not be admissible at trial; thus, the party opposing summary judgment must demonstrate that they can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists, and that a trial is necessary." (citing *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).)

---

[7] The same goes for Defendants' identical arguments about Ellis Frazier's affidavit.

Defendants' arguments are underdeveloped such that they are likely not properly before the Court. *See United States v. Clark*, 469 F.3d 568, 570 (6th Cir. 2006) ("[A]n issue is deemed forfeited . . . if it is merely mentioned and not developed.") Defendants do not affirmatively argue that any particular statement in Nard's affidavit is hearsay. They only offer brief, conclusory allusions to the *possibility* that these affidavits "might not be admissible." (ECF No. 96, PageID.3556.) Mentioning that something is possible is not the same thing as asserting a legal conclusion and arguing why the Court should adopt that conclusion. The Sixth Circuit has stated that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citing *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir. 1995)) (cleaned up). The Sixth Circuit has indicated that such perfunctory arguments are not acceptable when raising hearsay objections. *United States v. Jeffries*, 457 F. App'x 471, 482 (6th Cir. 2012) ("Because [the defendant] does not direct the attention of

36

this court to any of the statements that he considers improperly admitted, and because hearsay determinations turn entirely upon the precise words or conduct at issue, we cannot make an informed judgment whether the trial court abused its discretion and must therefore uphold its decision [].") There is a manifest absence of developed argument here.

Even if Defendants' arguments had been properly presented to the Court, there is not a basis to exclude Nard's statements as hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801. Federal Rule of Civil Procedure 56 requires that the evidence presented to oppose summary judgment be presentable at trial in an admissible form, which means hearsay evidence "must be disregarded." *Alexander*, 576 F.3d at 558. "Evidence containing multiple levels of hearsay is inadmissible for its truth unless each layer, analyzed independently falls within an established hearsay exception or is treated as nonhearsay." *Debiasi v. Charter Cnty. of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (citing Fed. R. Evid. 805; *Moore v. KUKA Welding Sys. & Robot Corp.,* 171 F.3d 1073, 1081 (6th Cir. 1999)).

Nard's affidavit discusses his reports of what Lockhart told him, including Lockhart's description of what he saw the night of the crime

37

and how Johnson pressured him to implicate Cotton. (ECF No. 102-18, PageID.5284–5285.) Nard also explains that he told Bates "everything" Lockhart told him and provided Bates with notes on Nard's conversations with Lockhart. (*Id.* at PageID.5285.) There are potential hearsay concerns regarding these statements, which were made out of court. Some of these statements involve potentially multiple layers of hearsay, insofar as they involve Lockhart reporting what Johnson said or what Nard told Bates that Lockhart said.

Those statements are only inadmissible if the out-of-court statements in the affidavit are being offered for the truth of the matter asserted. "An out-of-court statement offered to prove something other than the truth of the matter asserted falls outside the definition of hearsay and is admissible." *United States v. Boyd*, 640 F.3d 657, 663–64 (6th Cir. 2011). For example, an out-of-court statement offered to prove someone's knowledge of something is not hearsay. *Id.* at 664 ("Statements offered to prove the listener's knowledge are not hearsay."). "Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein,

are not hearsay." *United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999).

Here, these statements are being offered to prove a *Brady* violation. As set forth above, that requires showing "(1) the evidence at issue is favorable []; (2) the State, either willfully or inadvertently, suppressed that evidence; and (3) prejudice ensued." *Harbison*, 408 F.3d at 830. As to Nard's statements to Bates about Lockhart's reports of being threatened and bribed by Johnson, (ECF No. 102-18, PageID.5285), there are potentially three layers of hearsay: (1) Johnson's threats and inducements, (2) Lockhart's statements to Nard about those threats and inducements, and (3) Nard's statements to Bates about Lockhart informing him about those threats and inducements.

First, Johnson's threats are not being offered for their truth, to prove that Johnson would have hurt Lockhart if he had not provided a statement identifying Cotton, Legion, and Parks. Instead, they are non-hearsay threats, which are offered to show their impact on Lockhart. *See Bellomo,* 176 F.3d at 586.

Second, Lockhart's statements to Nard, described in Nard's affidavit, are also not being offered for their truth. They are offered to

39

show that favorable evidence was suppressed during the criminal trial. In the criminal trial, Nard could have testified to Lockhart's experiences and motivations, which would have been introduced as impeachment evidence. (*See* ECF No. 102, PageID.4895–4896.) The affidavit shows that Nard's testimony would have involved discussion of Lockhart's statements, as well as non-assertive conduct that Nard observed. (ECF No. 102-18, PageID.5285 (stating that Lockhart "show[ed] me what look[ed] like several thousand dollars in a rubber band wrapped in a brown paper bag" after giving police a statement).) Testimony about that conduct, observed by Nard and reported in his affidavit, as well as any admissible statements Lockhart made to him, could have undermined Lockhart's credibility in front of the jury during Plaintiffs' criminal trial. In the present civil litigation, this evidence would be offered to a jury to show that there was favorable impeachment evidence available at the criminal trial, which was never made available to Plaintiffs. That is, this testimony about Lockhart's interactions with Nard would be offered to prove a *Brady* claim that certain evidence was suppressed during the criminal trial. The statements would not be offered to prove the truth of the matter asserted, namely assertions about what Lockhart in fact said

40

or did prior to the criminal trial. These statements are therefore not inadmissible hearsay.

Third, Nard's statements to Bates are offered to show that Bates knew about this impeachment evidence. Offering an out-of-court statement to prove knowledge is a non-hearsay purpose. *Boyd*, 640 F.3d at 664. This evidence, which is central to Plaintiffs' *Brady* claims, is therefore not inadmissible hearsay because every layer of the statement is admissible.

The Court conducted the above hearsay analysis despite Defendants failing to present a proper hearsay objection to the Nard affidavit. The Court declines to go through every statement in the Nard affidavit to analyze it for hearsay.[8] *Jeffries*, 457 F. App'x at 482. The above analysis reveals that even if Defendants had properly presented objections to centrally important portions of the Nard affidavit, those objections would fail.

---

[8] The above analysis focuses on Plaintiffs' *Brady* claims. Defendants do not mention the word hearsay in their objections to Plaintiffs' other claims. Therefore, the Court will not go further than the above hearsay analysis. The Court will not concoct objections "out of whole cloth" when Defendants have not raised them. *Citizens Awareness Network*, 59 F.3d at 294.

41

Plaintiffs have presented admissible evidence to show that there was testimony favorable to Plaintiffs, which Bates suppressed, in turn prejudicing them at their criminal trial. The suppression of this important impeachment evidence against a key witness "undermine[s] confidence in the verdict." *Kyles*, 514 U.S. at 435. Accordingly, Defendants' arguments for granting summary judgment on Plaintiffs' *Brady* claims grounded on the Nard evidence fail with respect to Bates.

The evidence set forth above creates a genuine dispute of material fact as to whether Bates violated Plaintiffs' *Brady* rights, but whether Hughes also did is a separate question. The Nard affidavit names Bates, but it does not name Hughes. (ECF No. 102-18.) To bring a *Brady* claim against Hughes, Plaintiffs must establish that he suppressed the evidence Nard provided. *Harbison*, 408 F.3d at 830. Logically, to suppress evidence, Hughes would have had to know about that evidence.

Plaintiffs argue that Bates' testimony establishes that he informed Hughes of this information. (ECF No. 102, PageID.4895.) In Bates' deposition, he agreed that the DPD "operates as a . . . paramilitary organization" and has a "strict reporting structure." (ECF No. 102-19, PageID.5321.) He further agreed that, as a result, he had a responsibility

to inform the officer-in-charge, Hughes, of what he learned from witnesses, and he would have fulfilled that responsibility in this case. (*Id.* at PageID.5321–5323.) Bates indicated that this duty would have applied to the Nard evidence:

> Q: And so officer -- or Donald Hughes is the officer in charge by virtue of the paramilitary structure, he would know what you learned from the witnesses.
> A: He should.
> Q: And he would know what Kurt Nard told you.
> A: He should know that.
> . . .
> Q: So if [what Kurt Nard says about meeting you] is true, you did tell Donald Hughes this information?
> A: Yes.

(*Id.* at PageID.5322–5323.) Although Bates denies that he met with Nard, there is a genuine dispute of material fact about that issue. Bates' deposition testimony constitutes an admission that if the jury disbelieves him or finds that his memory is unreliable and concludes that he spoke with Nard, they should infer that Bates told Hughes what Nard said. Such testimony is admissible. *United States v. Kerley*, 784 F.3d 327, 336–40 (6th Cir. 2015) (holding that lay witnesses may testify in response to hypothetical questions based on their "particularized knowledge" of an organization's "policies, practices, or procedures"); *Appalachian Reg'l*

43

*Healthcare, Inc. v. U.S. Nursing Corp.*, 824 F. App'x 360, 371 (6th Cir. 2020) (holding that a lay witness could testify about her inferences based on knowledge of policies in a hospital where she was a nurse). Bates testified—based on his personal, particularized knowledge about his role as a DPD officer—about what he would have done if he had spoken to Nard. Because a reasonable jury could find that Bates spoke to Nard, they could also find—based on Bates' testimony about DPD practices and his adherence to them—that he told Hughes what he had learned.

Defendants agree that this material was never disclosed to prosecutors. Their position is that Nard "may not exist."[9] (ECF No. 105, PageID.5835.) There is therefore a genuine dispute of material fact for a jury to determine regarding both Bates and Hughes' liability for *Brady* violations related to the Nard evidence. Accordingly, Defendants' arguments fail with respect to this evidence, and the *Brady* claim based on the Nard evidence may proceed against Bates and Hughes.

  c. *Hughes' Taped Conversation and His Knowledge About Lockhart*

---

[9] To the extent that defense counsel stated otherwise at oral argument, claiming that Nard exists, and Cotton's criminal trial counsel knew about him, he ultimately abandoned that position and stated he lacked the knowledge to make such a representation.

According to Plaintiffs, Hughes also violated *Brady* by failing to disclose that he "knew Lockhart did not see the shooters and that his story was untrue." (ECF No. 102, PageID.4898.) The basis for this allegation is that a now-deceased private investigator "surreptitiously taped a conversation he had with Donald Hughes in or around 2010."[10] (*Id.*)

During that conversation, Hughes makes two statements about Lockhart, a key witness in Plaintiffs' criminal trial.[11] He states that Lockhart had "never seen" Cotton and "doesn't know him," which clashes with Lockhart's identification of Cotton. (ECF No. 102-22, PageID.5348.) Hughes also asserts that Lockhart "didn't have no gun." (*Id.* at PageID.5354.) Plaintiffs argue that this statement indicates that "Hughes knew Lockhart did not have a gun at any time (so his story about

---

[10] An officer who worked with Hughes identified Hughes' voice on the relevant tape. (ECF No. 102-32, PageID.5642.)

[11] Hughes also refers to an "off the record" interview with a drug dealer named Zachary Hearns who "put [him] on Cotton." (ECF No. 102-22, PageID.5351–5352.) At oral argument, Plaintiffs asserted that this statement about undisclosed evidence was not an independent *Brady* claim, but that it would indicate problems with the integrity of the investigation that a jury could have considered.

45

shooting inside the house was not true which was consistent with the lack of physical evidence)." (ECF No. 102, PageID.4877.)

To find that this taped conversation indicates that Hughes committed a *Brady* violation, his statements would have to reveal that he suppressed evidence uncovered during the investigation. *Harbison*, 408 F.3d at 830. Which evidence was suppressed is not clear, however. The Hughes tape demonstrates that around 2010, Hughes had beliefs that clashed with the statements Lockhart made during Plaintiffs' criminal trial in 2001. Viewed in "the light most favorable" to Plaintiffs, a reasonable jury could infer that Hughes' taped statements indicate that he held these beliefs at the time of the investigation. *Skousen*, 305 F.3d at 526. To support a finding of a *Brady* violation, however, there must be more than just an officer's beliefs or opinions; there must be evidence that was suppressed. As a result, a jury would have to infer from the tape that Hughes' beliefs were based on evidence—tangible or not—that Hughes suppressed. Hughes does not refer to any such evidence on the tape, nor does he provide any basis for his beliefs. Plaintiffs' discussion of the Hughes tape does not resolve this question, either. (ECF No. 102, PageID.4877, 4898.) The tape certainly raises questions about why

46

Hughes would express skeptical views about Lockhart's trial testimony. But Plaintiffs do not offer evidence that answers that question. The record does not establish why Hughes may have held beliefs that clashed with Lockhart's. As a result, it would be speculative for a jury to infer—based on this tape alone—that there was suppressed evidence that existed prior to the 2001 trial and that supported the beliefs Hughes expressed in 2010. The Hughes tape does not create a genuine dispute of material fact as to whether Hughes suppressed evidence in violation of his *Brady* obligations. Accordingly, Defendants' motion for summary judgment is granted in part, and Plaintiffs may not bring a *Brady* claim grounded exclusively on the statements in Hughes' taped conversation.[12]

d.   *Ellis Frazier Evidence*

Plaintiffs allege Bates and Hughes failed to reveal that they fabricated Frazier's testimony.[13] (ECF No. 102, PageID.4898–4900.)

---

[12] Nonetheless, the tape may be admissible evidence at trial for some other purpose. The Court does not reach that question.

[13] Plaintiffs also refer to the existence of a "Snitch Witness Program." (ECF No. 102, PageID.4899.) That allegation is about the failure to disclose DPD's alleged pattern of solicitating false testimony in other cases. Troubling as such an allegation is, Plaintiffs must assert the failure to disclose evidence that relates to these Plaintiffs' criminal case. The Court does not resolve whether evidence of such a program is admissible for other purposes, but the failure to disclose solicitation of

In a 2014 affidavit, Frazier states that he never met Cotton, let alone heard his murder confession. (ECF No. 102-20, PageID.5339.) He explains that after contacting the "Prosecutor's Office" and expressing interest in getting out of jail by working as an informant, "the Homicide Detective" pre-wrote the police statement, provided him with all the relevant information about the crime, and instructed him to memorize a fabricated story to provide as trial testimony. (*Id.*) As a condition of his deal for an earlier release, "the Detective" and the prosecutor instructed him not to discuss the deal and, in accordance with that instruction, he lied about it in court, Frazier explains. (*Id.* at PageID.5340.) He identified Cotton in court based on a picture shown to him by "the Detective" that brought him there to testify. (*Id.*) In Cotton's deposition, he stated that Hughes and Adams got Frazier from the county jail. (ECF No. 102-33, PageID.5670.) In Bates' deposition, he acknowledged that Frazier's statement was in Bates' handwriting with the exception of Frazier's signature. (ECF No. 102-19, PageID.5309.) Bates is also listed as the

---

false testimony in other cases does not constitute an independent *Brady* violation in this case.

48

person who took Frazier's witness statement. (ECF No. 102-13, PageID.5070.)

A reasonable jury could find that Bates committed a *Brady* violation by inducing Frazier to sign a false pre-written statement and coaching his trial testimony. Frazier's testimony and Bates' role in taking Frazier's statement would allow a reasonable jury to conclude that the relevant evidence was fabricated. Evidence that this testimony was fabricated would have been strongly favorable to Plaintiffs. Additionally, a reasonable jury could conclude that the evidence of fabricated testimony was suppressed. Bates does not assert that he told the prosecution about any such fabrication. Instead, he denies that he fabricated evidence. There is therefore a genuine dispute of material fact for a jury to resolve about whether this evidence was suppressed.[14]

---

[14] There is not, however, an independent claim about suppression of Frazier's deal for reduced time in custody. Frazier states in his affidavit that the prosecutor was aware of that deal, (ECF No. 102-20, PageID.5340), so the officers are not liable for failing to turn over that information to prosecutors. *See D'Ambrosio*, 747 F.3d at 389 ("*Brady* obliges a police officer to disclose material exculpatory evidence only to the prosecutor rather than directly to the defense[.]"). Disclosure of Frazier's deal to prosecutors means Plaintiffs cannot bring an independent *Brady* claim against Defendants with respect to that deal.

49

Further, this concealment prejudiced Cotton at trial. Frazier's testimony was a powerful part of the prosecution's closing argument. (*See* ECF No. 102-17, PageID.5272–5273 (stating that Cotton told Frazier things "only the killer could know" and that this "confession" was made to a non-police officer, "which makes it even more reliable").) Bates' suppression of this evidence about fabrication therefore meets the criteria for a *Brady* violation.

Plaintiffs also allege that Hughes violated his *Brady* obligations with respect to this evidence. As set forth above, the evidence that Frazier's testimony was fabricated is favorable to Plaintiffs and its suppression would have been prejudicial to them at trial. To bring a claim against Hughes, however, Plaintiffs must demonstrate that there is a genuine dispute as to whether he personally suppressed this material. Because Plaintiffs offer admissible evidence in support of their claim against Hughes and Defendants provide no evidence to rebut Plaintiffs' allegation, the Court denies summary judgment on this issue with respect to Hughes.

Several pieces of evidence support Plaintiffs' contention that Hughes suppressed evidence that would have revealed Frazier's

50

testimony to be fabricated. Plaintiffs state that Hughes brought Frazier to court and, based on "Frazier's affidavit and Cotton's testimony, a jury could reasonably conclude that Hughes showed Frazier a picture of Cotton so he would know whom to identify in court." (ECF No. 102, PageID.4900.) In Frazier's affidavit, he states that "[t]he Detective that brought me to the Courthouse showed me a picture of Marvin Cotton and told me where he would be sitting in the Courtroom so that I could identify him" because otherwise he would not have known what Cotton looked like. (ECF No. 102-20, PageID.5340.) Cotton stated in his deposition that when Frazier testified "Investigator Hughes and Santonio[n] Adams actually walked over to the county jail and got them together." (ECF No. 102-33, PageID.5670.) A reasonable jury could hear this testimony and infer that Hughes brought Frazier to the courthouse, as well as that Hughes was the one who showed him a picture of Cotton and pointed him out in the courtroom. There is therefore a genuine dispute of material fact as to whether Hughes participated in fabricating Frazier's testimony and whether he failed to share his awareness of that testimony's falsity with the prosecution.

At oral argument on this motion, defense counsel denied that these events occurred and suggested that Frazier was induced to recant his testimony. But he then represented that Defendants lacked any evidence to rebut the evidence Plaintiffs offered in support of these claims. For these reasons, the Court denies Defendants' motion for summary judgment with respect to Plaintiffs' *Brady* claims against Bates and Hughes that relate to Frazier's testimony being fabricated.[15]

### iii.    Federal Malicious Prosecution Claims

Plaintiffs also bring a claim for malicious prosecution against Hughes under federal law. (ECF No. 3, PageID.54–59.)

Plaintiffs argue that Hughes is liable for "the initiation of charges and Plaintiffs' continued detention by his fabrication of the Kenn[e]th Lockhart identification evidence and Lockhart's conforming testimony at

---

[15] Defendants asserted that there was some kind of incongruity involved in Plaintiffs' assertion of both *Brady* and fabrication of evidence claims. On the contrary, bringing both claims is entirely proper. These claims are by no means mutually exclusive, and Defendants have provided no reason to think otherwise—either in their briefing or during oral argument. *See Gregory v. City of Louisville*, 444 F.3d 725, 750–51 (6th Cir. 2006) ("It is not the role of this Court to restrict Plaintiff's choice of viable legal theories. Other courts have allowed plaintiffs to pursue two legal theories under § 1983 premised on the same underlying facts. *See Atkins v. County of Riverside,* 151 Fed. App'x 501, 505–06 (9th Cir. 2005) (unpublished opinion) (permitting plaintiff to pursue, simultaneously, both a fabrication of evidence claim and a *Brady* violation claim).").

the Preliminary Examination." (ECF No. 102, PageID.4904.) Specifically, Plaintiffs argue that Hughes

> recklessly omitted material facts necessary to the determination of probable cause, i.e., that he knew Lockhart's identification of Plaintiffs was false. Hughes knew that Lockhart's story about the shooting (he returned fire at the shooters while inside his bedroom) was contradicted by the lack of physical evidence in the house; the "Donald Hughes tape" evidence shows he knew Lockhart did not have a gun and did not see or know Cotton; and knew from Nard's meeting with Bates that Lockhart was sleeping when the shooting began and only identified Plaintiffs because of pressure (and a $10,000 payment) from his uncle, Keith Johnson.

(*Id.* at PageID.4905.)

### a.   *Legal Standard*

The Sixth Circuit

"recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment," which "encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright,* 449 F.3d 709, 715–16 (6th Cir. 2006) (internal quotation marks omitted). The "tort of malicious prosecution" is "entirely distinct" from that of false arrest, as the malicious-prosecution tort "remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process." *Wallace v. Kato,* 549 U.S. 384, 390, 127 S. Ct. 1091, 166 L. Ed. 2d 973 (2007) (internal quotation marks omitted).

53

*Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). It is essentially a claim for "unreasonable prosecutorial seizure." *Id.* at 310.

The elements of malicious prosecution are: (1) that the defendant made, influenced, or participated in the decision to prosecute the plaintiff and the criminal prosecution was initiated; (2) there was a lack of probable cause for the criminal prosecution; (3) the criminal prosecution caused the plaintiff to suffer a deprivation of liberty as established in the Fourth Amendment jurisprudence (beyond the initial seizure); and (4) the criminal proceeding must have terminated in the plaintiff's favor. *Id.* at 308–09. "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017).

> b.    *Whether Hughes Made, Influenced, or Participated in the Decision to Prosecute the Plaintiff*

The first factor in the malicious prosecution analysis is whether Defendants made, influenced, or participated in the decision to prosecute. Plaintiffs argue that Hughes "recklessly omitted material facts necessary to the determination of probable cause, i.e., that he knew Lockhart's identification of Plaintiffs was false." (ECF No. 102, PageID.4905.) They

54

point to the Sixth Circuit's instruction that influence over a prosecution can occur through "'knowing misstatements . . . to the prosecutor' or [] 'pressure or influence' over an individual who either made the decision to prosecute or testified at the preliminary hearing." *Sykes*, 625 F.3d at 316 (citation omitted). Omissions in an officer's investigatory materials that are provided to prosecutors can constitute such influence. *See id*. at 314– 317.

Hughes did not testify at the preliminary hearing, so Plaintiffs' claim is based on the omissions Hughes made, particularly as they relate to Lockhart's testimony. (ECF No. 102, PageID.4905–4906.) The state court found probable cause to bring Plaintiffs to trial in significant part based on Lockhart's identification of Cotton and Legion. (ECF No. 102-12, PageID.5067.) Plaintiffs assert that Hughes knew Lockhart's testimony was false based on issues with the physical evidence, the Hughes tape (that Plaintiffs argue indicates Hughes knew Lockhart never had a gun nor saw Cotton), and evidence from Nard that Plaintiffs assert Bates would have given to Hughes. (ECF No. 102, PageID.4905.) The Court has already set forth the limitations of the Hughes tape as evidence. Nonetheless, the other evidence supports Plaintiffs' claim that

Hughes knew Lockhart was offering false testimony. A reasonable jury could infer that Hughes influenced the prosecution by putting forward Lockhart as a witness who identified Plaintiffs, (ECF No. 102-6, PageID.4947; ECF No. 102-7, PageID.4950), and failing to state to prosecuting authorities that he knew Lockhart's testimony was fabricated. *See Phat's Bar & Grill v. Louisville Jefferson Cnty. Metro Gov't*, 918 F. Supp. 2d 654, 661 (W.D. Ky. 2013) (stating that the first factor in the analysis is satisfied if an officer presents false information to prosecuting authorities (citing *Sykes*, 625 F.3d at 312)).

Defendants argue that the Court should apply a standard different from the one set forth by the Sixth Circuit. They insist that prosecutors, not police officers, try defendants and therefore Defendants did not "institute or maintain" criminal proceedings against Plaintiffs. (ECF No. 96, PageID.3558.) That omits portions of the first criteria for malicious prosecution, which includes influencing or participating in a decision to prosecute. *See Sykes*, 625 F.3d at 308. Defendants reference *Sykes* and then continue to make this argument, (ECF No. 96, PageID.3557), despite the Sixth Circuit's rejection of their position. *Sykes*, 625 F.3d at 311 ("[C]ontrary to the Defendants' assertion, the fact that they did not

56

*make* the decision to prosecute does not per se absolve them from liability. Instead, the Plaintiffs were entitled to prove that the Defendants either 'influence[d] or participate[d] in the decision to prosecute.'"). Defendants' arguments with respect to this issue therefore fail.

> c.   *Probable Cause*

The second factor in a federal malicious prosecution claim is whether there was probable cause for Plaintiffs' prosecution and continued detention. Defendants argue that the trial court already decided there was probable cause and therefore that issue "cannot be relitigated here." (ECF No. 96, PageID.3557.) This argument fails.

The cases Defendants cite do not support their position. *Autrey v. Stair* sets forth that if "a plaintiff in a § 1983 cause of action can point to instances where the consideration of falsehoods or the omission of material exculpatory evidence could have colored a state-court judge's probable-cause determination, there is no requirement that the initial finding be given preclusive effect in the federal-court action." 512 F. App'x 572, 579 (6th Cir. 2013); *see also Harcz v. Boucher*, 763 F. App'x 536, 544 (6th Cir. 2019) ("[A] prior probable cause finding does not prevent a plaintiff from relitigating probable cause where the plaintiff claims that

57

the witness who testified at the state proceeding misstated or knowingly misrepresented the facts used to establish probable cause. . . . A plaintiff can bring malicious prosecution claims against police officers if the plaintiff alleges . . . that a misleading police report influenced the state court's determination of probable cause for arrest and prosecution." (cleaned up)).

The other case cited by Defendants does not involve any assertion of falsehoods or omission of exculpatory evidence. *See Smith v. Thornburg*, 136 F.3d 1070 (6th Cir. 1998). Plaintiffs allege such violations here, however, so their claim is only precluded if they are unable to establish that Hughes asserted falsehoods or omitted evidence in a manner that influenced the prosecution. Accordingly, this argument fails, and the Court is not precluded from considering Plaintiffs' malicious prosecution claims.

Plaintiffs indeed argue that there was no probable cause. The Sixth Circuit sets forth the standard for probable cause as follows:

> [a] probable cause determination is based upon the "totality of the circumstances" and must consider "both the inculpatory and exculpatory evidence." *Wesley*, 779 F.3d at 429 (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). That means an officer cannot "'simply turn a blind eye' toward

evidence favorable to the accused," *id.* (quoting *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999)), nor "ignore information which becomes available in the course of routine investigations," *Fridley v. Horrighs*, 291 F.3d 867, 873 (6th Cir. 2002). That said, "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." *Ahlers*, 188 F.3d at 371. However, [a plaintiff] need only make a "minimal showing of credibility . . . that the defendants did not have probable cause." *Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243 (6th Cir. 1989). Unless "there is only one reasonable determination possible," this is a jury question. *Fridley*, 291 F.3d at 872 (citations omitted).

*Jones v. Clark Cnty., Kentucky*, 959 F.3d 748, 757 (6th Cir. 2020). In addition,

[a]n eyewitness identification constitutes probable cause "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation." *Ahlers v. Schebil,* 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks omitted).

*Skousen*, 305 F.3d at 528.

Although Lockhart provided an eyewitness identification, Plaintiffs argue that he was lying or testifying inaccurately. The evidence from Nard and Bates—set forth above—permits a jury to conclude that

Hughes knew that Lockhart was being pressured and bribed to provide his eyewitness identification.

Plaintiffs must also show that the omission of this information was material to the finding of probable cause. *Sykes*, 625 F.3d at 312. The state court made clear that it relied on Lockhart's testimony in finding that there was probable cause. (*See* ECF No. 102-12, PageID.5067.) Defendants agree. (ECF No. 105, PageID.5833 ("To be clear: the decision to bind Plaintiffs over for trial was based on Lockhart's testimony. . . . Now and forever, let it be reiterated: Lockhart's preliminary examination testimony sealed Plaintiffs' fate.").) The parties concur that Lockhart's testimony was material to the finding of probable cause. There is, however, a genuine dispute of material fact about whether—at the relevant time—Hughes had a reason to know that Lockhart's testimony was fabricated or otherwise inaccurate. Defendants' arguments for granting summary judgment on this claim based on probable cause therefore fail.

### d. *Deprivation of Liberty*

The third factor in the federal malicious prosecution analysis is whether the prosecution caused Plaintiffs to suffer a deprivation of

liberty. *Sykes*, 625 F.3d at 308–09. Although Defendants do not contest that Cotton suffered a deprivation of liberty, they argue that Legion's nolo contendere plea and sentence in an unrelated case means he suffered no such deprivation. (ECF No. 96, PageID.3558–3559.) They point out that the Michigan Court of Claims held that Legion was ineligible for compensation under WICA, because that law does not permit compensation when someone is "serving a valid concurrent sentence." (ECF No. 96-28, PageID.4748.)

The Court of Claims found that during the entire period when Legion was incarcerated in relation to McIntyre's murder, he was serving an 8½ to 20 year-sentence. (*Id.* at PageID.4749–4750 ("Legion's concurrent sentence was independent of his wrongful convictions and covered the entirety of his imprisonment for his wrongful convictions.").) As set forth above, the Court of Claims' interpretation of WICA does not preclude the Court's consideration of Plaintiffs' claims under § 1983 or state malicious prosecution law. *See supra* Section III.A.iv.

Even if the Court adopted the reasoning presented by the Court of Claims, it would not support Defendants' position. As the Court of Claims acknowledged, the statute's prohibition on compensation for wrongful

61

convictions when someone is serving a valid concurrent sentence is intended to "keep[] [Michigan] courts out of situations in which the plaintiff and the State would likely each present conflicting evidence about when the plaintiff may have been released if the wrongful conviction had never occurred." (ECF No. 96-28, PageID.4750.) That statement acknowledges that there is at the least a fact question about what the length of Legion's detention would have been in the absence of his convictions related to McIntyre's murder. Courts have recognized that when someone is incarcerated for two different charges—one valid and the other invalid—a difference between the length of the sentences means there is a deprivation of liberty sufficient to bring a malicious prosecution claim. *See Allen v. City of New York*, 480 F. Supp. 2d 689, 717–18 (S.D.N.Y. 2007); *see also Howse v. Hodous*, 953 F.3d 402, 409 n.3 (6th Cir. 2020) (recognizing that if additional invalid charges lengthen someone's detention that changes the nature of a seizure). The Court of Claims' ruling Defendants cite references the fact question about whether Legion's conviction for McIntyre's murder lengthened his detention. In light of that fact question, Defendants' arguments that Legion suffered no deprivation of liberty fail.

Defendants do not raise the fourth factor—whether the proceeding terminated in Plaintiffs' favor—and therefore the Court need not address it. Accordingly, Defendants' arguments for granting summary judgment on Plaintiffs' federal malicious prosecution claims against Hughes fail.

### iv.      State Malicious Prosecution Claims

Defendants also argue for summary judgment on Plaintiffs' malicious prosecution claim under state law. They assert that they have immunity under Michigan law and also that Plaintiffs' state-law claim is time-barred.

### a.      Malice or Lack of Good Faith

Defendants argue that under state law a government employee is immune from tort liability unless they are grossly negligent or—as is relevant here—they commit an intentional tort without good faith or with malice. (ECF No. 96, PageID.3560 (citing *Odom v. Wayne Cnty.*, 482 Mich. 459, 479–80 (2008)).) Unlike a federal malicious prosecution claim in the Sixth Circuit, one of the elements of malicious prosecution under Michigan law is malice. *Payton v. City of Detroit*, 211 Mich. App. 375, 395 (1995); *Peterson Novelties, Inc. v. City of Berkley*, 259 Mich. App. 1, 21 (2003). To bring their malicious prosecution claim under Michigan law,

63

Plaintiffs must provide evidence sufficient for a jury to find that Hughes acted with malice or lack of good faith.

Malice means more than failing to include all exculpatory facts but instead involves knowingly swearing to false facts without which there would be no probable cause. *Payton*, 211 Mich. App. at 395. To act with malice in this context involves acting with a purpose other than "bringing the offender to justice." *Walsh v. Taylor*, 263 Mich. App. 618, 633 (2004) (cleaned up).

Plaintiffs respond that absence of probable cause implies the presence of malice. (ECF No. 102, PageID.4912.) They cite to a Michigan Supreme Court case that states that it would be appropriate to have a jury instruction stating that "while the jury may infer malice from want of probable cause it need not necessarily do so." *Renda v. Int'l Union Auto, Aircraft, and Agric. Implement Workers of Am.*, 366 Mich. 58, 100 (1962). Not long after *Renda*, the Michigan Court of Appeals held

> [t]here must be both the absence of probable cause and the presence of malice. If plaintiff fails to prove either of these key elements, he will lose his case. The main focus is usually upon probable cause, because if this is established, it becomes irrelevant whether defendant was also motivated by malice. Prosser, Torts (3d ed.), s 113, pp. 859, 860. Also, there is a consideration of defendant's good faith involved in the

64

> determination of probable cause, so that it is sometimes said
> that malice may be inferred from lack of probable cause,
> though the converse inference is not permitted. *Drobczyk v.*
> *Great Lakes Steel Corp., Supra*, 367 Mich. p. 323, 116 N.W.2d
> 736.

*Belt v. Ritter*, 18 Mich. App. 495, 503 (1969). Following the reasoning in

*Belt*, malice can be inferred from lack of probable cause insofar as

someone knowingly and falsely swears that facts in a complaint are true,

thereby negating probable cause and demonstrating malicious intent. *Id.*

at 504. Courts must consider whether an officer provides false evidence

in a report "without which the prosecutor could not have concluded there

was probable cause[.]" *King v. Arbic*, 159 Mich. App. 452, 466 (1987).

Plaintiffs must therefore show a lack of probable cause in a manner

that suggests Hughes knowingly and falsely swore to the facts that

formed the basis for probable cause. Plaintiffs indeed allege that Hughes

"framed" Plaintiffs using fabricated evidence. (ECF No. 3, PageID.62.) As

set forth above, they have created a genuine dispute of material fact

about whether Hughes knowingly presented fabricated testimony from

Lockhart to the prosecutors—evidence that the parties agree formed the

basis for finding probable cause. Accordingly, because Plaintiffs provide

evidence that Hughes acted with malice or lack of good faith, Defendants

65

fail to show that he has immunity from their malicious prosecution under state law.

### b.   *Statute of Limitations*

Defendants further argue that Plaintiffs "are time-barred from pursuing this claim. Under 42 U.S.C. § 1983 and Mich. Comp. Law § 600.5805(7), the three-year limitations period began running the date of their arrest." (ECF No. 96, PageID.3561.) This lawsuit was filed January 6, 2022, and it relates to events that occurred in 2001. Plaintiffs' criminal convictions were vacated on October 1, 2020, one year, three months, and five days before the lawsuit was filed. Due to several deficiencies, Defendants' arguments regarding the statute of limitations fail.

First, it is unclear why Defendants reference § 1983 in a section of their brief related to a state-law claim for malicious prosecution. Even if they intend to make a broader argument, they misstate when a § 1983 claim for malicious prosecution accrues. *Dunn v. State of Tenn.*, 697 F.2d 121, 127 (6th Cir. 1982) ("[F]avorable termination of the prior criminal proceeding marks the point at which a 1983 claim for malicious prosecution accrues."). The relevant proceeding did not terminate

66

favorably for Plaintiffs until their convictions were vacated, less than two years before they filed this suit. *See Smith*, 2023 WL 8788944, at *13.

Defendants' arguments regarding Plaintiffs' malicious prosecution claims under Michigan law fare no better.

Defendants misstate the statute of limitations for a malicious prosecution claim brought under Michigan law. In general, the statute of limitations for torts in Michigan is three years after the injury occurs. Mich. Comp. Laws § 600.5805(2). However, the "period of limitations is 2 years for an action charging malicious prosecution." Mich. Comp. Laws § 600.5805(7). Defendants are therefore incorrect when they assert that there is a three-year statute of limitations for Plaintiffs' malicious prosecution claim. (*See* ECF No. 96, PageID.3561.)

Defendants also misstate when a malicious prosecution claim under Michigan law accrues. Accrual occurs when "all the elements of a cause of action have occurred and can be alleged in a proper complaint." *Parisi v. Mich. Twp. Ass'n*, 123 Mich. App. 512, 514 (1983) (citations omitted). Malicious prosecution requires that the proceedings terminate in favor of the plaintiff before a claim can be brought. The proceedings did not terminate in Plaintiffs' favor until their convictions were vacated, which

67

was less than two years before they brought suit. Accordingly, Defendants' argument that Plaintiffs' malicious prosecution claim under Michigan law is time-barred fails.

        *v.*     *Fabrication of Evidence Claims*

Plaintiffs also assert fabrication of evidence claims against Hughes and Bates. Plaintiffs' fabrication claims are based on Lockhart and Frazier's statements being fabricated. (ECF No. 102, PageID.4911.) In the Complaint, Plaintiffs assert that Hughes fabricated Lockhart's identification of Plaintiffs and Bates fabricated Frazier's statement and testimony about Cotton's "jailhouse confession." (ECF No. 3, PageID.59.)

        *a.*     *Legal Standard*

The Sixth Circuit has instructed that "[i]t is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Gregory*, 444 F.3d at 737 (citing *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)). A claim for fabrication of evidence may be brought when the fabricated evidence is used as a basis for criminal charges. *Jackson v. City of Cleveland*, 925 F.3d 793, 816 (6th Cir. 2019). This claim is distinct from

a claim of withholding evidence, insofar as fabrication involves manufacturing damaging evidence whereas withholding evidence is about suppressing favorable evidence. *Mills v. Barnard*, 869 F.3d 473, 485 (6th Cir. 2017).

### b.    *Probable Cause*

Defendants argue that because "Plaintiffs were both bound over for trial as a direct result of Lockhart's testimony, there is no question that probable cause existed that they committed the murders and, under *Robertson* [*v. Lucas*, 753 F.3d 606 (6th Cir. 2014)], that their arrests were lawful." (ECF No. 96, PageID.3560.) Relying on *Robertson*, they argue that "when there is probable cause to arrest and detain an individual, they cannot prevail on a fabrication of evidence claim as they were not wrongfully seized." (*Id.* at PageID.3559.)

In *Robertson*, the Sixth Circuit held that there was qualified immunity for the officers "because there was probable cause to arrest and detain appellants, they cannot prevail on their fabrication of evidence claim as they were not wrongfully seized." *Robertson*, 753 F.3d at 619. It also stated that there was no evidence the appellees influenced the testimony that led to the appellants' prosecutions and detentions. *Id.*

Before and after *Robertson*, the Sixth Circuit has held that finding probable cause does not undermine a fabrication of evidence claim. Insofar as Sixth Circuit rulings are inconsistent, the earlier ruling is binding. *See United States v. Hamm*, 400 F.3d 336, 340–41 (6th Cir. 2005). In *Stemler v. City of Florence*, which significantly predates *Robertson*, the Sixth Circuit held that "[a] claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant." 126 F.3d 856, 872 (6th Cir. 1997). The Court is bound by *Stemler*'s ruling, which subsequent Sixth Circuit opinions have repeatedly relied upon. *See Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015); *France v. Luca*s, 836 F.3d 612, 629 (6th Cir. 2016); *Tanner v. Walters*, 98 F.4th 726, 733 (6th Cir. 2024).

Moreover, even if Plaintiffs were required to demonstrate a lack of probable cause to bring a fabrication of evidence claim, they have done so, as set forth above. *See supra* Section III.B.iii.c. Accordingly, Defendants' arguments based on probable cause for granting summary judgment on Plaintiffs' fabrication of evidence claims fail.

       c.    *Plaintiffs' Substantive Fabrication of Evidence Claims*

Defendants do not raise any further specific objections to Plaintiffs'
fabrication of evidence claims. They do, however, generally assert
qualified immunity, which places the burden on Plaintiffs to demonstrate
a genuine dispute of material fact as to whether Defendants committed
a constitutional violation. *Wiley v. City of Columbus*, 36 F.4th 661, 669
(6th Cir. 2022). The Court therefore considers whether the evidence
produced to support Plaintiffs' fabrication of evidence claims is sufficient
to survive summary judgment.

A fabrication of evidence claim can be based on the creation of false
materials that are used to secure a conviction. *Mills*, 869 F.3d at 485
(discussing allegations of the manufacture and misrepresentation of
evidence, as well as the presentation of a false report). Plaintiffs allege
that Hughes knew Lockhart's identification of them could not have been
legitimate. (ECF No. 3, PageID.42.) A reasonable jury could conclude
based on the Nard affidavit and Hughes' conversation with Myree, among
other evidence, that Hughes knew that Lockhart's identification was
false.

To bring a fabrication of evidence claim, Plaintiffs must also show
Hughes manufactured inculpatory evidence as opposed to withholding

71

evidence that would have been favorable to Plaintiffs. *Mills*, 869 F.3d at 485. An officer can manufacture evidence in a variety of ways. *See*, *e.g.*, *Jackson*, 925 F.3d at 816 (officer participated in coercing a false statement from a witness); *Gregory*, 444 F.3d at 744–45 (forensic examiner produced a report that falsely stated hairs matched the plaintiff's hair); *Tanner v. Walters*, 98 F.4th 726, 732–33 (6th Cir. 2024) (officer's report falsely attributed statements to Plaintiff that she never said); *Ricks v. Pauch*, No. 20-1778, 2021 WL 4775145, at *4 (6th Cir. 2021) (unpublished) (officers fabricated a match between bullets and a handgun).

Even if there is a question of fact about whether Hughes knew about and withheld the fact that Lockhart was testifying falsely, there is not sufficient evidence to create a genuine dispute that he influenced or coerced Lockhart to testify falsely. In support of their fabrication of evidence claim, Plaintiffs assert that—based on Hughes' comments to Myree in 2010—a reasonable jury could conclude that Hughes fabricated Lockhart's identification of Plaintiffs at the photo array. (ECF No. 102, PageID.4910.) But the comments Plaintiffs cite are Hughes' statements years after the fact that Lockhart did not see the shooters. (*Id.*) It would

be speculative for a jury to conclude from such a statement that Hughes influenced or coerced Lockhart. There is insufficient evidence of that with respect to Hughes—in contrast to the evidence that Johnson may have been influencing and coercing Lockhart to identify Plaintiffs. In discussing their malicious prosecution claims, Plaintiffs also refer to things that Hughes knew but omitted to disclose. (ECF No. 102, PageID.4905.) Again, such allegations do not support the conclusion that Hughes was fabricating or manufacturing evidence in a manner the Sixth Circuit has recognized as forming the basis for a fabrication of evidence claim. Because the evidence produced by Plaintiffs does not support the inference that Hughes manufactured—as opposed to withheld—evidence, they cannot bring a fabrication of evidence claim against him. Accordingly, the Court grants summary judgment as to Hughes with respect to Plaintiffs' fabrication of evidence claim against him.

In contrast, Plaintiffs provide sufficient evidence to support their fabrication of evidence claim against Bates. Plaintiffs have brought forward evidence that Bates induced Frazier to provide false testimony at trial. Frazier's affidavit and his related witness statement creates a genuine dispute of material fact as to whether Bates knowingly induced

73

Frazier to provide false testimony that Cotton confessed. (ECF No. 102-20.) The Sixth Circuit has set forth that a confession is uniquely powerful evidence. *United States v. Zakhari*, 85 F.4th 367, 378 (6th Cir. 2023) ("A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.'" (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (White, J., dissenting))). Such powerful evidence likely influenced the judgment of the jury, as revealed by the way it was emphasized during closing arguments. (*See* ECF No. 102-17, PageID.5272–5273 (stating that Cotton told Frazier things "only the killer could know" and that this "confession" was made to a non-police officer, "which makes it even more reliable").) Accordingly, the Court denies summary judgment as to Plaintiffs' claims against Bates.

## IV.  Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiffs have voluntarily dismissed their claims against Adams and Wilson. Accordingly, Defendants' motion for summary judgment is GRANTED with respect to Adams and Wilson.

74

As set forth above, Defendants' motion for summary judgment is

GRANTED IN PART and DENIED IN PART with respect to Hughes and

Bates.

IT IS SO ORDERED.

Dated: February 5, 2025          s/Judith E. Levy
Ann Arbor, Michigan              JUDITH E. LEVY
                                 United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 5, 2025.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager